RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067
Telephone: (310) 229-1234
Facsimile:  (310) 229-1244
E-Mail: rb@lnbyb.com; pag@lnbyb.com; kjm@lnbyb.com

Proposed Counsel for Krystal Koach, Inc.,
Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

In re

KRYSTAL KOACH, INC, a California
corporation,

      Debtor and Debtor in Possession.

Case No. 8:10-bk-26547-RK

Chapter 11

NOTICE OF MOTION AND MOTION OF
DEBTOR FOR ORDER ESTABLISHING
SALE PROCEDURES FOR SALE OF
DEBTOR'S ASSETS FREE AND CLEAR OF
ALL LIENS, CLAIMS, ENCUMBRANCES
AND OTHER INTERESTS PURSUANT TO
SECTIONS 105 AND 363 OF THE
BANKRUPTCY CODE AND GRANTING
RELATED RELIEF; MEMORANDUM OF
POINTS AND AUTHORITIES;
DECLARATIONS IN SUPPORT THEREOF

Date:      December 7, 2010
Time:     4:00 p.m.
Place:    Courtroom 5D
        411 West Fourth Street
        Santa Ana, CA 92701-4593

1

# **TABLE OF CONTENTS**

2

**Page**

3    MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 3

4    I.    JURISDICTION AND VENUE ............................................................................ 3
5
     II.    STATEMENT OF FACTS ................................................................................... 3
6
7          A.    Background ............................................................................................... 3

8          B.    Circumstances That Led To The Chapter 11 Filing ................................... 5

9          C.    The Debtor's Primary Assets And Primary Liabilities .............................. 7

10          D.    Post-Petition Financing and Cash Collateral Provisions ........................... 8

11          E.    The Efforts to Market the Acquired Assets for Sale ................................... 9

12          F.    Brief Description of Terms of Sale of The Acquired Assets ....................... 10
13
           G.    Proposed Sale Procedures ............................................................................ 10
14
15    III.    GOOD CAUSE EXISTS TO APPROVE THE DEBTOR'S PROPOSED
            SALE PROCEDURES ........................................................................................ 13
16
     IV.    CONCLUSION ................................................................................................... 17
17
18    DECLARATION OF WALTER BOWSER ........................................................................ 18

19    DECLARATION OF LAWRENCE R. PERKINS ............................................................ 24

20    DECLARATION OF PHILIP A. GASTEIER ................................................................... 26

21    EXHIBIT 1 ........................................................................................................................ 28

22    EXHIBIT 2 ........................................................................................................................ 36

23    EXHIBIT 3 ........................................................................................................................101

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

## CASES

Bennett v. Williams
  892 F.2d 822 (9th Cir.1989) ------------------------------------------------------------ 16

In re 995 Fifth Ave. Assoc., L.P.
  96 B.R. 24 (Bankr. S.D.N.Y. 1989) ------------------------------------------------------ 15

In re Ames Dep't Stores, Inc., Eastern Retailers Service Corp., et al.
  115 B.R. 34 (Bankr. S.D.N.Y. 1990) ---------------------------------------------------- 14

In re Atlanta Packaging Products, Inc.
  99 B.R. 124 (Bankr. N.D. Ga. 1988) --------------------------------------------------- 14

In re Consolidated Auto Recyclers, Inc.
  123 B.R. 130 (Bankr.D.Me. 1991)------------------------------------------------------- 15

In re Crowthers McCall Pattern, Inc.
  114 B.R. 877 (Bankr. S.D.N.Y. 1990) -------------------------------------------------- 14

In re Financial News Network, Inc.
  126 B.R. 152 (Bankr. S.D.N.Y. 1991) -------------------------------------------------- 15

In re Girard Medical Center
  1990 WL 56486, *2 (Bankr.E.D.Pa. 1990) ------------------------------------------- 16

In re Integrated Resources, Inc.
  147 B.R. 650 (S.D.N.Y. 1992) ----------------------------------------------------------- 15

In re S.N.A. Nut Co.
  186 B.R. 98 (Bankr. N.D.Ill. 1995)----------------------------------------------------- 15

In re Wheeling-Pittsburgh Steel Corp.
  72 B.R. 845 (Bankr.W.D.Pa. 1987)----------------------------------------------------- 16

## STATUTES

11 U.S.C. § 1107--------------------------------------------------------------------------------- 3
11 U.S.C. 1108 ----------------------------------------------------------------------------------- 3
28 U.S.C. § 1408--------------------------------------------------------------------------------- 3
28 U.S.C. § 157 ---------------------------------------------------------------------------------- 3
28 U.S.C. 1334 ----------------------------------------------------------------------------------- 3
28 U.S.C. 1409 ----------------------------------------------------------------------------------- 3

## RULES

Fed.R.Bankr.P. 6004(f)------------------------------------------------------------------------ 13

1      PLEASE TAKE NOTICE that, on December 7, 2010, at 4:00 p.m., before the

2 Honorable Robert Kwan, United States Bankruptcy Judge, Krystal Koach, Inc., debtor and

3 debtor-in-possession in this bankruptcy case (the "Debtor") will move the Bankruptcy Court for

4 an order establishing procedures for the sale of substantially all of the Debtor's assets, free and

5 clear of all liens, claims, encumbrances and other interests pursuant to Sections 105 and 363 of

6 the Bankruptcy Code and granting related relief (the "Sale Procedures Motion").

7      PLEASE TAKE FURTHER NOTICE that the Sale Procedures Motion is based upon

8 this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the

9 Declarations of Walter Bowser, Lawrence Perkins and Philip A. Gasteier submitted herewith,

10 Local Bankruptcy Rules 6004-1, the records and files in this Chapter 11 case, and such

11 additional evidence and argument as may be presented at or before the hearing on the Sale

12 Procedures Motion.

13     PLEASE TAKE FURTHER NOTICE that pursuant to Local Bankruptcy Rule 6004-

14 1(b)(4), any party wishing to respond to the Sale Procedures Motion must file with the

15 Bankruptcy Court and serve on counsel for the Debtor a written response at least one (1) day

16 before the hearing. Pursuant to Local Bankruptcy Rule 9013-1(h), failure to timely file and

17 serve a response in accordance with the Local Bankruptcy Rules may be deemed by the

18 Bankruptcy Court to be consent to the granting of the relief requested in the Sale Procedures

19 Motion.

20 Dated: November 24, 2010      LEVENE, NEALE, BENDER, YOO &
                        BRILL L.L.P.

21

22                     By     /s/ Philip A. Gasteier

23                        RON BENDER
                        PHILIP A. GASTEIER

24                        KRIKOR J. MESHEFEJIAN
                        Attorneys for Debtor and Debtor in Possession

25

26

27

28

2

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.

3

## JURISDICTION AND VENUE

4   Krystal Koach, Inc., debtor and debtor in possession herein (the "Debtor"), commenced

5 its bankruptcy case by filing a Voluntary Petition under Chapter 11 of the Bankruptcy Code on

6 November 15, 2010 ("Petition Date").  The Debtor continues to operate its business and

7 manage its financial affairs as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

8 The Debtor seeks herein an approval of the proposed sale procedures described herein (the

9 "Sale Procedures") and as fully set forth in Exhibit "1" attached to the Declaration of Philip A.

10 Gasteier appended hereto ("Gasteier Declaration") for the sale of substantially all of the

11 Debtor's assets, free and clear of all liens, claims, encumbrances and other interests pursuant to

12 Sections 105 and 363 of the Bankruptcy Code and granting related relief.

13   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This

14 matter relates to the administration of the Debtor's bankruptcy estate and is accordingly a core

15 proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), (M) and (O).  Venue of this case is

16 proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the

17 relief requested in this Sale Procedures Motion are Section 105 and 363 of the United States

18 Code (the "Bankruptcy Code"), and Rules 4001, 6004 and 6006 of the Federal Rules of

19 Bankruptcy Procedure.

20

## II.

21

## STATEMENT OF FACTS

22 **A.   Background.**

23   1.   The Debtor commenced its bankruptcy case by filing a voluntary petition under

24 Chapter 11 of the Bankruptcy Code on November 19, 2010 (the "Petition Date").  The Debtor

25 continues to operate its business, manage its financial affairs and operate its bankruptcy estate

26 as a debtor in possession.

27   2.   The Debtor is one of the largest independent manufacturers of stretch limousines

28 and customer shuttle buses in the United States. Founded twenty-seven years ago by Edward P.

3

1    Grech ("Grech") as a small-scale operation conceived in an unassuming automotive repair
2    shop, the Debtor grew into nearly a $150 million annual revenue company that is a premier
3    manufacturer in its industry.  The Debtor is currently one of only a few manufacturers in the
4    world certified by both Ford's Lincoln-Mercury division and General Motors' Cadillac division
5    to modify their respective vehicles into limousines.  Wholly owned by Grech (the Debtor's
6    President and Chief Executive Officer), who is widely regarded by industry and regional
7    publications as a progressive, creative leader, and who is known as a senior patriarch in the
8    custom coach industry, the Debtor has obtained the reputation of designing and manufacturing
9    top-notch, high-end, limousines, shuttle buses and other specialty vehicles that are unparalleled
10   in the industry.

11          3.      The Debtor has been an industry pioneer and leader, manufacturing and selling
12   its vehicles to limousine operators, dealerships, corporations, and individuals throughout the
13   world.  With sales at both the retail and dealer level, the Debtor has achieved a premium brand
14   within the industry, commands premium prices, and enjoys a reputation for quality, safety, and
15   excellence in design.  For example, the Debtor is one of the few manufacturers to voluntarily
16   conduct crash tests of its vehicles to ensure quality and safety.  The Debtor has further
17   differentiated itself from its rivals by being a premium designer and manufacturer that caters to
18   all phases of the luxury transportation industry.  The Debtor sells products in six main
19   categories:  Ford-Lincoln based limousines, shuttle buses, hearses, hybrid buses, limousine
20   buses, and SUV limousines.  Within the stretch limousine market, the Debtor currently has an
21   estimated 30% market share, and within the shuttle bus market, the Debtor currently has an
22   estimated 5% market share which is growing.

23          4.      The Debtor acquires most of the car chassis that form the core of its product
24   from Ford Motor Company ("Ford").  These purchases have historically been provided to the
25   Debtor pursuant to a purchasing line of credit (the "Ford Line") made available from Ford
26   Motor Credit ("Ford Credit") and additional lines of credit (the "Comerica Lines") made
27   available from Comerica Bank ("Comerica").

28

4

1    5.    Ford Credit and Comerica assert a security interest in, among other things, the
2  car chassis that Ford sells to the Debtor.  Ford Credit retains title documentation for each car
3  chassis as security until the car is delivered into Mexico where the process of converting the
4  vehicle into a limousine begins.  At the time that the car is transported into Mexico, Ford Credit
5  is paid for the car and title documentation for the vehicle is transferred to Comerica.  As each
6  finished limousine is then sold, Comerica releases the title documentation to the Debtor, and the
7  Debtor provides the same to the customer.

8    6.    Similarly, Ford sells to the Debtor truck chassis.  The truck chassis are not,
9  however, financed by Ford Credit.  Instead, the Debtor and Ford are parties to a consignment
10 agreement whereby Ford retains title to the truck chassis until the truck chassis is transported to
11 Mexico.  At the time the truck chassis is transported into Mexico, Ford is paid for the truck
12 chassis, and title documentation for the truck is transferred to Comerica.  As each finished
13 specialty truck is then sold, Comerica releases the title documentation to the Debtor, and the
14 Debtor provides the same to the customer.

15 **B.    Circumstances That Led To The Chapter 11 Filing**.

16    7.    The Debtor showed consistent and formidable growth from its inception until
17 2007. After expanding to three facilities in the Southern California region, with more than 800
18 employees and almost $150 million in annual revenue, starting in 2007, the Debtor began to see
19 a drop in revenue caused as a result of various external factors which the Debtor has attempted
20 to counteract through the implementation of various cost-cutting measures.

21    8.    The overall downturn in the economy has had a significant impact on the
22 Debtor's industry.  As consumers have reduced their use of luxury products such as limousines,
23 the Debtor's business has suffered.  As a result of the decrease in the use of limousines,
24 replacing existing limousines has become less necessary for the Debtor's customers.
25 Accordingly, less orders have been placed, less limousines have been manufactured, and less
26 revenue has been generated.  Due to the decrease in demand, revenue has decreased in the
27 industry as a whole, as manufacturers and sellers are willing to sell their product at discounted
28 rates.

5

9.      Indeed, in an effort to mitigate its losses caused by the decrease in demand due to the economic recession, the Debtor has been forced to reduce sales prices on its existing inventory. Additionally, due to a highly anticipated Ford-Lincoln Town Car body style expected to be released, major customers of the Debtor have refrained from additional purchases of existing models. Given the image-driven nature of the limousine industry, particularly with up-scale clientele such as major Las Vegas hotel and casino chains which purchase vehicles from the Debtor, there has been a degree of hesitancy to purchase new units, as such clients have opted to wait for the release of newer models expected to be introduced in 2012.

10.     As a result of the foregoing, the Debtor's business has experienced significant financial pressure. In 2008, revenues fell to approximately $100 million. This trend continued through 2009, as the Debtor saw revenues fall to approximately $35 million.

11.     To help alleviate the financial strain being experienced by the Debtor, the Debtor implemented various cost-cutting measures. First, the Debtor was compelled as a result of the recession to reduce the number of its employees, from a high of approximately 800 in 2007, to currently approximately 100. Additionally, starting in 2009, the Debtor closed two of its manufacturing locations in Southern California. Instead, the Debtor began to outsource a majority of its vehicle manufacturing work to a sister company -- Krystal International, S.A. DE C.E. (a Mexican company) ("KI"). KI currently completes approximately 85% of each vehicle in Mexico. The vehicle is then shipped to the United States where it is completed in the Debtor's existing Southern California facility, and then sold. The Debtor pays KI for labor costs and related expenses. Such outsourcing has allowed the Debtor to streamline its costs and position itself to be a more profitable company, while ensuring exacting quality and safety. The shift in manufacturing to KI has marked a strategic shift in the Debtor's overall business model, as the Debtor has started to focus upon marketing and distribution while outsourcing production to a less costly alternative source.

6

1    12.    Nevertheless, while these cost-cutting measures have helped the Debtor
2    reorganize its business, financial challenges are still prevalent in the industry and with the
3    Debtor's business.

4    13.    The Debtor currently suffers from a cash-flow crunch which the Debtor intends
5    to address with debtor-in-possession financing.  Additionally, the Debtor has actively marketed
6    its business for sale for an extended period of time and has reached an agreement with a buyer,
7    which is affiliated with the entity that will be providing the Debtor with the necessary debtor-
8    in-possession financing.  The Debtor intends to embark on an expedited sale process to sell its
9    business to the highest bidder.

10    **C.    The Debtor's Primary Assets And Primary Liabilities**.

11    14.    The Debtor's primary assets consist of: (a) vehicle and parts inventory; (b)
12    equipment and tools; (c) accounts receivable; and (d) ownership interest in Edson Financial,
13    Inc., which provides equipment and vehicle financing to, among others, customers of the
14    Debtor.

15    15.    Petition Date consist of the following:

16        a.  Pre-Petition Revolving Loans –$7,398,301.81.

17        b.  Pre-Petition Installment Loan –$878,762.36.

18        c.  Pre-Petition Swap Obligations –$42,000.

19        d.  Pre-Petition L/C Obligations –$907,000.

20        e.  Guaranties - The Debtor has also guaranteed various loans and obligations as
21            discussed in the Cash Collateral Stipulation

22    16.    As security for the Pre-Petition Revolving Loan, Pre-Petition Installment Loan,
23    Pre-Petition Swap Obligations, Pre-Petition L/C Obligations, and Guaranties, Comerica asserts
24    a first priority security interest in all of the Debtor's assets.

25    17.    The Debtor owes approximately $1,390,832 to Ford Credit pursuant to the Ford
26    Line.  Ford Credit asserts a security interest in the chassis which it financed and proceeds
27    thereof.

28

7

1     18.    The Debtor has liabilities to trade creditors of approximately $2.6 million,
2 various vehicle financing obligations and other miscellaneous liabilities, and potential liabilities
3 in pending lawsuits, which are subject to insurance coverage.

4 **D. Post-Petition Financing and Cash Collateral Provisions.**

5     19.    Currently, the Debtor does not have access to sufficient funds to continue
6 operations for more than a very short period of time, which is why the Debtor sought court
7 approval of $2.5 million in debtor-in-possession financing. In addition, the Debtor has entered
8 into a Cash Collateral Stipulation with Comerica (the "Cash Collateral Stipulation"). The
9 Budget included with the Cash Collateral Stipulation assumes, among other things, that the
10 Debtor will obtain debtor-in-possession financing in the amount of $2.5 million, which,
11 together with use of cash collateral as authorized by the Stipulation, will provide sufficient
12 funds for the Debtor to continue operation through early January 2011.

13     20.    The Cash Collateral Stipulation requires that the Debtor file a motion to approve
14 the bidding procedures for the sale of all or substantially all of the Debtor's assets under
15 Section 363 of the Bankruptcy Code within five (5) business days following the Petition Date;
16 obtain entry of an order approving the sale, on terms acceptable to Comerica, on or before
17 January 10, 2011; and consummate the sale on or before January 25, 2011. Correspondingly,
18 the DIP Financing Agreement requires that the Debtor obtain entry of an order approving the
19 sale on or before January 12, 2011 and close the sale on or before January 26, 2010.

20     21.    Pursuant to the Cash Collateral Stipulation, any order approving the sale of
21 assets of the Debtor in this case shall provide for the payment of the sale proceeds at closing, as
22 follows: First, (A) to Comerica in the amount of the Pre-Petition Loans, Pre-Petition Swap
23 Obligations, Pre-Petition L/C Obligations (except to the extent such obligations have previously
24 been repaid or are assumed by the purchaser in a transaction acceptable to Comerica, and (B) to
25 any other senior lien holder (whose collateral is being sold pursuant to such sale) the value of
26 such senior lien holder's allowed secured claim (except to the extent such obligations are
27 assumed by the purchaser); second, to the Debtor $500,000 (the "Estate Funds"), which Estate
28 Funds shall remain with the Debtor's estate to be used to fund the wind down of the Debtor's

8

1  estate and to distribute the remaining balance to claim holders in accordance with their
2  priorities under the Bankruptcy Code under what is expected to be a liquidating plan of
3  reorganization, with Comerica agreeing that the Estate Funds shall be free and clear of any of
4  Comerica's liens; third, to the debtor-in-possession financing lender in an amount equal to the
5  outstanding amounts due under the applicable debtor-in-possession financing documents;
6  fourth, to Comerica in the amount of the remaining Pre-Petition Obligations; and fifth, to the
7  Debtor.

8  **E.    The Efforts to Market the Acquired Assets for Sale**.

9  22.    The Acquired Assets have been marketed for sale for an extended period.  The
10 Debtor previously retained a business broker for several years to explore interest in a strategic
11 partner or buyer.  In December 2009 the Debtor retained El Molino Advisors, Inc. as financial
12 advisor.  In March and April 2010, the Debtor commenced a more orderly process of actively
13 identifying potentially interested parties and inquiring as to their interest.

14 23.    This process intensified in early September 2010.    El Molino circulated
15 investment and information memoranda containing facts, projections and other relevant
16 information.  El Molino arranged for and assembled an electronic data room which was made
17 available to interested buyers or strategic investors.  El Molino directly contacted in excess of
18 20 potentially interested parties, including competitors, industry players and distressed market
19 investors.  Although the Debtor reached a tentative understanding with the Buyer's affiliate in
20 late September 2010, these marketing efforts continued and resulted in expressions of interest.
21 However, none of the expressions of interest indicated a level of value to the Debtor equal to
22 that offered by the Buyer.

23 24.    In the course of seeking interest and making available information regarding the
24 Debtor's business and assets, El Molino also made available information regarding the related
25 companies Imperial Highway, LLC ("Imperial"); Krystal Enterprises, LLC ("Enterprise"); and
26 Enterprise's subsidiary, KI.  Imperial owns and leases to the Debtor the Debtor's headquarters
27 building.  As discussed above, KI performs much of the manufacturing work in Mexico to
28 create the Debtor's product.  All of the parties contacted were made aware that all of the related

9

1   assets could be made a part of any transaction. El Molino will continue to provide such related

2   entity information in responding to interested parties in accord with the Sale Procedures

3   discussed below.

4   **F.    Brief Description of Terms of Sale of The Acquired Assets**.

5       25.    The foregoing marketing efforts have produced an agreement to purchase the

6   Acquired Assets pursuant to the terms set forth in that certain Asset Purchase Agreement (the

7   "Purchase Agreement") between the Debtor and Krystal Infinity, LLC (the "Buyer"), dated

8   November 19, 2010, a copy of which is attached hereto as Exhibit "2."

9       26.    By way of summary (and subject to the specific terms of the Purchase

10  Agreement), the principal terms of the Purchase Agreement are as follows:

11          a.    Aggregate Purchase Price $9,000,000, which is expected to consist of

12      cash in the amount of $6,500,000 and the credit of the DIP Financing in the amount of

13      $2,500,000, plus the assumption of additional direct indebtedness of anticipated to

14      exceed $2.67 million and certain contingent liabilities.

15          b.    The Acquired Assets will include substantially all of the Debtor's assets

16      relating to its business.    The Acquired Assets will be sold "as-is," with no

17      representations or warranties surviving closing.

18          c.    The sale is subject to higher and better bids and to entry of a final order

19      approving the sale.

20  **G.    Proposed Sale Procedures**.

21      The following are the proposed Sale Procedures:

22      1.    El Molino Advisors, Inc ("El Molino"), which is serving as the Debtor's
    financial advisor and marketing consultant, shall continue to seek and respond to interested
23  purchasers based on the marketing information previously assembled by El Molino, including
    an electronic "data room" which contains customary information about the Debtors' business.
24  El Molino will share this information, and such other information as may reasonably be
    requested, with any prospective buyer who executes a confidentiality agreement (which can be
25  obtained from El Molino) and who demonstrates to El Molino that the prospective buyer has
    the reasonable financial ability to participate in an auction sale process within the required time
26  frame.    To the extent that viable prospective buyers desire to obtain additional financial
    information from the Debtor beyond the information that El Molino compiled, El Molino will
27  make every reasonable effort to facilitate providing that additional information to the
28  prospective buyer.

10

1

2

Interested parties should contact Lawrence Perkins of El Molino as follows:

3

Lawrence Perkins
Email: lperkins@elmolinoinc.com
Phone: 213-291-2547

4

    2.    The actual auction sale (the "Auction") will take place on Tuesday, January 4,

5 2011 (or two business days prior to the sale hearing date, whichever is later) commencing at
10:00 a.m. at 10250 Constellation Boulevard, 17th Floor, Los Angeles, California 90067 or such

6 other location as determined by El Molino to be in the best interests of the Debtor's estate.

7     3.    Substantially all of the Debtors' assets are available to be purchased, free and
clear of all liens, claims and interests, except for those assets which are designated as

8 "Excluded Assets" in the Asset Purchase Agreement (the "Lead Bidder APA") between the
Debtor and Krystal Infinity, LLC, a Nevada Limited Liability Company (the "Lead Bidder").

9     4.    In order to be eligible to participate in the auction sale, a prospective bidder will
be required to do the following: (a) Not less than twenty-four hours prior to the Auction, deliver

10 a deposit in clear funds in the amount of $500,000 (the "Deposit") to the Debtors' bankruptcy
counsel which will be held in a segregated account and which will be non-refundable in favor

11 of the Debtor's bankruptcy estate if the bidder is deemed to be the winning bidder at the auction

12 sale, has its bid (and the Debtor's corresponding asset sale) approved by the Bankruptcy Court,
and fails to close its purchase of the Debtor's assets in a timely manner; (b) be deemed to be

13 financially qualified to participate in the auction sale by El Molino, the Debtor and secured
creditor Comerica Bank (the "Bank"), with the Bankruptcy Court to be the forum to resolve any

14 disputes in this regard; (c) deliver to El Molino, counsel for the Bank and counsel for the
Debtor, not less than twenty-four hours prior to the Auction, a written markup of the Lead

15 Bidder APA showing any proposed changes the buyer has to the Lead Bidder APA, which can

16 be obtained from El Molino; (d) either in the markup of the Lead Bidder APA, or separately,
deliver to El Molino, counsel for the Bank and counsel for the Debtor, not less than twenty-four

17 hours prior to the Auction, a written statement demonstrating a willingness to make an offer
with total value in an amount at least equal to the sum of (x) the value offered by the Lead

18 Bidder;  plus (y)  the Breakup Fee identified in paragraph 9 below ($300,000), plus (z)

19 $100,000 (such sum being referred to herein as the "Minimum Overbid Amount") (which shall
be deemed the bidder's offer to purchase); and (e) deliver to El Molino, counsel for the Bank

20 and counsel for the Debtor, not less than twenty-four hours prior to the Auction,  (i) a written
statement identifying any connection the prospective bidder has to any member of the Debtor's

21 Board of Directors or senior management at the time the deposit is delivered or, if the
connection arises thereafter, as soon as the connection becomes known ; (ii) information as to

22 the identity of the bidder, including if a corporate or other business entity, the identity of the

23 principals of the bidder entity; and (iii) current financial statements of the prospective buyer, or
such other form of financial disclosure acceptable to the Debtor, El Molino and the Bank

24 demonstrating the prospective bidder has sufficient financial resources to close the sale by
January 25, 2010.  The submitted APA must not contain any contingencies to the validity,

25 effectiveness and/or binding nature of the offer, including without limitation, contingencies for
financing, due diligence or inspection.

26     5.    If more than one qualified bidder complies with the requirements of paragraph 4

27 above and appears at the auction sale, El Molino will randomly assign bidding numbers to the
bidders.  The following is how the bidding will work by example if there are three qualified

28 bidders at the auction sale.  The bidder who is assigned bidding #1 will be required to submit

11

1 the first bid, unless the Lead Bidder is assigned bidding #1, in which case the bidder who is
assigned bidding #2 will be required to submit the first bid. If the first bid is not equal to or
2 greater than the Minimum Overbid, the initial bidder shall be out and the bidding will pass to
the next sequential number until a qualified bid is received. Once a bid equal to or greater than
3 the Minimum Overbid is received, that bid will be deemed a qualified bid and the bidding will
4 then proceed to the bidder with the next sequential number. That next bidder will then be
required to submit a bid which is at least $100,000 higher than the qualified bid submitted by
5 the first bidder or drop out of the auction sale. The bidding will then turn to the bidders with
the next sequential numbers and then back to bidder #1 and continue (with bidding increments
6 of at least $100,000) until all bidders but one have dropped out of the auction sale at which
7 point the bidder who made the highest bid will be deemed the highest bidder, subject to the
Bank's credit bid rights. Once a bidder elects not to make a bid which is at least $100,000
8 higher than the previously made qualifying bid, the bidder will be deemed to have dropped out
of the auction and will not be permitted back into the auction thereafter. If the Bank does not
9 exercise its credit bid rights, the bidder who submitted the second highest bid at the auction sale
will be deemed to constitute the winning backup bidder. The Lead Bidder shall not in any
10 manner be deemed the back up bidder unless it specifically agrees to said status in writing.

11      6.      Notwithstanding any other provision of this Order, the Debtor and the Bank
shall collectively decide which bid made at the auction is the highest and best bid for the
12 Debtors' estates with the greatest weight to be given to the amount of cash consideration being
received, with any disagreement to be resolved by the Bankruptcy Court.

13      7.      The Debtor's sale of assets to the winning bidder (or the winning backup bidder
if the winning bidder fails to close its purchase in a timely manner) shall be made on an "AS IS
14 WHERE IS" basis with no representations or warranties other than those representations and
15 warranties which are specifically provided for in the asset purchase agreement submitted by the
winning bidder (or the winning backup bidder if the winning bidder fails to close its purchase in
16 a timely manner).

        8.      The date and time of the hearing for the Bankruptcy Court to consider approval
17 of the Debtor's sale of assets to the winning bidder at the auction sale (as well as any request by
the Debtor to assume and assign to the winning bidder any of the Debtor's executory contracts
18 and unexpired leases that the winning bidder wishes to have assigned to it) will be January __,
19 2011 at 10:00 a.m. Subject only to entry by the Bankruptcy Court of the sale order, the
winning bidder will have until January 25, 2011 to consummate the sale. If the winning bidder
20 fails to do so, the winning bidder will be deemed to have forfeited its $ Deposit unless the
Bankruptcy Court or the Debtors and the Bank agree to provide the winning bidder an
21 extension of time to close. If the winning bidder fails to close and forfeits its Deposit, the
22 winning back up bidder will be notified and will then have fifteen days to close its purchase of
the Debtor's assets or will be deemed to have forfeited its deposit unless the Bankruptcy Court
23 or the Debtor and the Bank agree to provide the winning backup bidder an extension of time to
close. The Deposit of the backup bidder will be retained by the Debtor following the
24 conclusion of the auction sale and will be returned to the backup bidder on the earlier to occur
of (i) the closing by the winning bidder of its purchase of the Debtor's assets or (ii) January 26,
25 2011 provided the winning bidder has closed its purchase of the Debtor's assets by that date.

        9.      In the event that a competing bid to acquire all or a substantial part of the Assets
26 is approved by the Court (an "Alternative Transaction") and the Lead Bidder is not the
27 purchaser of the Acquired Assets as a result, the Lead Bidder shall be entitled to be paid an
amount equal to the reasonable expenses incurred by Buyer's representatives, agents,
28 employees and attorneys and professionals in connection with its investigation, negotiation,

1   structuring and financing of the Sale (including, but not limited to, legal, accounting,
consulting, auditing, and financial advisory fees) in an amount up to and including $300,000
2   (the "Break-Up Fee"),  provided that, the Break-Up fee shall only be payable if (a) the Lead
Bidder agrees in writing at the Auction to be the backup bidder, and (b) the Alternative
3   Transaction closes.   The Break-Up Fee shall be paid from the sale proceeds at the Closing of
4   the Alternative Transaction, or as soon thereafter as any dispute regarding the amount of the
Breakup Fee is fully resolved, with such payment to be free and clear of all claims, liens and
5   interests in or on the property of the Debtor or the Bankruptcy Estate. An amount equal to the
maximum Breakup Fee of $300,000 shall be set aside from the sale proceeds of the Alternative
6   Transaction until the amount of the Breakup Fee is determined.   Any balance of the $300,000
7   remaining after payment of the Breakup Fee shall be distributed in accord with the Cash
Collateral Stipulation between the Debtor and the Bank.

8          10.     All Qualified Bidders shall be deemed to have consented to the core jurisdiction
of the Bankruptcy Court and to have waived any right to a jury trial in connection with any
9   disputes relating to the Auction and/or the Sale.   All asset purchase agreements shall be
governed by and construed in accordance with the laws of the State of California. All Qualified
10  Bidders shall be bound by their bids until conclusion of the Auction.

11         11.     The bidding procedures set forth herein (other than those provisions governing
the Breakup Fee and bid increments) may be modified without any further order of the
12  Bankruptcy Court provided that the Debtors and the Bank agree to such modifications.   Any
dispute over any such modifications shall be resolved by the Bankruptcy Court.

13

14                                      **III.**

15                  **GOOD CAUSE EXISTS TO APPROVE THE DEBTOR'S**

16                        **PROPOSED SALE PROCEDURES**

17         Bankruptcy Rules 2002 and 6004 govern the scope of the notice to be provided in the

18  event a debtor elects to sell property of the estate under Section 363; however, with respect to

19  the procedures to be adopted in conducting a sale outside the ordinary course of a debtor's

20  business, Bankruptcy Rule 6004 provides only that such sale may be by private sale or public

21  auction, and requires only that the debtor provide an itemized list of the property sold together

22  with the prices received upon consummation of the sale.  Bankr. R. 6004(f).

23         Neither the Bankruptcy Code nor the Bankruptcy Rules contain specific provisions with

24  respect to the procedures to be employed by a debtor in conducting a public or private sale.

25  Nonetheless, as one Court has stated, "[i]t is a well-established principle of bankruptcy law that

26  the objective of bankruptcy rules and the [debtor's] duty with respect to such sales is to obtain

27  the highest price or greatest overall benefit possible for the estate."   In re Atlanta Packaging

28

                                        13

1  Products, Inc., 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).   Additionally, courts have long
2  recognized the need for competitive bidding at hearings on private sales; "[c]ompetitive bidding
3  yields higher offers and thus benefits the estate.   Therefore, the objective is 'to maximize
4  bidding, not restrict it.'"  Id.

5          A corollary to these principles is that the court should not "cherry-pick" among
6  contractual provisions, objecting to select individual portions, if the agreement as a whole is
7  supported by an articulated business judgment.  At least one bankruptcy court has expressly
8  applied this corollary to a transaction including breakup and overbid provisions in the sale of
9  the debtor's business.  In In re Crowthers McCall Pattern, Inc., 114 B.R. 877 (Bankr. S.D.N.Y.
10  1990), the court approved a transaction including provisions relating to a breakup fee and a
11  requirement that overbids be at least $500,000.  In responding to objections to other provisions
12  of the agreement, the court held that:

13              The Court is not to second guess the inclusion of some
14              provisions as long as the Agreement as a whole is within
15              reasonable business judgment, and the subject provisions do not
16              distort the balance Congress struck in Chapter 11.  Cf. In re
17              Ames Dep't Stores, Inc., Eastern Retailers Service Corp., et al.,
18              115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 1990) (some contractual
19              provisions may be justified by the need to attract a prospective
20              investor.).

21  114 B.R. at 886.

22          The Debtor believes that the sale process conducted by the Debtor and its professionals
23  was and continues to be thorough and adequate to obtain the highest and best price for the
24  Acquired Assets, subject to the opportunity for others to participate in accord with the proposed
25  Sales Procedures.   The Sale Procedures serve numerous legitimate purposes.   The Sale
26  Procedures (i) foster competitive bidding among any serious potential purchasers; (ii) eliminate
27  from consideration purchasers who would waste the estate's time because they would not have
28  the financial ability to consummate the transaction; (iii) insure that the highest possible price is

14

1  obtained for the Acquired Assets; (iv) afford the broadest notice of the proposed sale as
2  possible under the circumstances; and (v) compensate the Buyer for the Buyer's time, effort,
3  costs and expenses incurred in connection with the Purchase Agreement. In light of the
4  difficult economic condition which continue to exist in the market in which the Debtor is
5  engaged, the challenges faced in the marketing of the Acquired Assets as detailed above and in
6  the Perkins Declaration, the Debtor submits that the Purchase Agreement and the attendant
7  proposed Sale Procedures are in the best interests of the Debtor's estate and its creditors.

8        The proposed Breakup Fee is reasonable given the amount of the proposed purchase
9  price and the complexity of the transaction. The Debtor is informed that the Buyer has
10  expended substantial time and resources with respect to the formulation of its offer,
11  negotiations with the Debtor, due diligence with respect to the proposed transaction. A breakup
12  fee such as the one which may be payable to the Buyer in the event of a successful overbid by
13  another party has been approved by numerous other courts. In general, "[a] 'break-up fee' is an
14  incentive payment to an unsuccessful bidder who placed the estate property in a sales
15  configuration mode ... to attract other bidders to the auction." In re Financial News Network,
16  Inc., 126 B.R. 152, 154 n. 5 (Bankr. S.D.N.Y. 1991); see also In re Integrated Resources, Inc.,
17  147 B.R. 650, 653 (S.D.N.Y. 1992), app dismissed on jurisdictional grounds, 3 F.3d 49 (2d Cir.
18  1993) ["[a] break-up fee, or more appropriately, a termination fee, is an incentive payment to a
19  prospective purchaser with which a company fails to consummate a transaction"]. Agreements
20  to provide breakup fees are designed to compensate the potential acquirer who serves as a
21  catalyst or "stalking horse' which attracts more favorable offers. In re S.N.A. Nut Co., 186
22  B.R. 98, 101 (Bankr. N.D.Ill. 1995); In re 995 Fifth Ave. Assoc., L.P., 96 B.R. 24, 28 (Bankr.
23  S.D.N.Y. 1989).

24        The Breakup Fee and all of the other Sale Procedures are reasonable in the business
25  judgment of the Debtor. "So long as a [debtor in possession] conducts the affairs of the estate
26  by exercising his business judgment in good faith, upon a reasonable basis, and within the
27  scope of his authority under the Code, he may proceed without interference." In re
28  Consolidated Auto Recyclers, Inc., 123 B.R. 130, 140 (Bankr.D.Me. 1991). Cf. Bennett v.

1  Williams, 892 F.2d 822, 824 (9th Cir.1989) (deference to business management decisions of
2  bankruptcy trustee).

3        In examining business transactions, the Court employs a deferential "business
4  judgment" rule.  "A debtor-in-possession is accorded great deference as to its business
5  judgments." In re Girard Medical Center, 1990 WL 56486, *2 (Bankr.E.D.Pa. 1990). See also
6  In re Wheeling-Pittsburgh Steel Corp., 72 B.R. 845, 849 (Bankr.W.D.Pa. 1987) ("courts accord
7  the debtor's business judgment a great amount of deference").

8        Local Bankruptcy Rule 6004-1 provides that a hearing on a motion to establish
9  procedures for the sale of assets may be scheduled on not less than 7 days notice. The notice
10 must describe the proposed procedures, describe the purchase agreement, describe the prior
11 marketing effort and provide that opposition may be filed on or before one day prior to the
12 hearing.  LBR 6004-1(b)(2).  A copy of this Notice of Motion and Motion, which complies
13 with LBR 6004-1(b)(2), is being served on the creditors listed on the list of twenty largest
14 creditors, counsel for secured creditors, all parties requesting notice, and the Office of the
15 United States Trustee, in accord with the Debtor's motion to limit notice which was granted
16 after hearing on November 23, 2010.  Service is being made on November 24, 2010, which is
17 13 days in advance of the hearing.

18       The Debtor submits that the foregoing benefits of the Sales Procedures and the
19 reasonable terms therefore support the Debtor's reasonable business judgment to seek approval
20 of the Sales Procedures, and that such should be approved.

21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

16

1

## IV.

2

## CONCLUSION

3      Wherefore, the Debtor respectfully requests that the Court enter an order (i) finding that

4 notice of the Motion was adequate and appropriate; (ii) granting the Motion in its entirety; (iii)

5 approving the Sale Procedures as set forth hereinabove; (iv) authorizing the Debtor to conduct a

6 sale of the Acquired Assets as set forth hereinabove; and (v) granting such other and further

7 relief as may be necessary or appropriate under the circumstances.

8 Dated: November 24, 2010          LEVENE, NEALE, BENDER, YOO &
                                    BRILL L.L.P.
9

10
                                    By _____/s/ Philip A. Gasteier_____ ____
11                                       RON BENDER
                                         PHILIP A. GASTEIER
12                                       KRIKOR J. MESHEFEJIAN
                                         Attorneys for Debtor and Debtor in Possession
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

## **DECLARATION OF WALTER BOWSER**

I, Walter Bowser, hereby declare as follows:

1.      I am over 18 years of age. I am the Chief Financial Officer of Krystal Koach, Inc. (the "Debtor"), the Chapter 11 debtor and debtor in possession herein, having assumed that position in December 2009. Except where otherwise indicated, the statements made herein that address any time period prior to the date I assumed my role as the Debtor's Chief Financial Officer are based on my review of the Debtors' books and records and other documents in the Debtors' possession. Except where otherwise indicated, all other statements are of my own personal knowledge, and if called upon, I could and would testify to their truth.

2.      I make this Declaration in support of the Debtor's "Motion for Order Establishing Procedures for the Sale of Substantially all of the Debtor's Assets, Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 105 and 363 of the Bankruptcy Code and Granting Related Relief" (the "Motion").

### **A.      Background**.

3.      The Debtor commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code on November 19, 2010 (the "Petition Date"). The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession.

4.      The Debtor is one of the largest independent manufacturers of stretch limousines and customer shuttle buses in the United States. Founded twenty-seven years ago by Edward P. Grech ("Grech") as a small-scale operation conceived in an unassuming automotive repair shop, the Debtor grew into nearly a $150 million annual revenue company that is a premier manufacturer in its industry. The Debtor is currently one of only a few manufacturers in the world certified by both Ford's Lincoln-Mercury division and General Motors' Cadillac division to modify their respective vehicles into limousines. Wholly owned by Grech (the Debtor's President and Chief Executive Officer), who is widely regarded by industry and regional publications as a progressive, creative leader, and who is known as a senior patriarch in the

1    custom coach industry, the Debtor has obtained the reputation of designing and manufacturing

2    top-notch, high-end, limousines, shuttle buses and other specialty vehicles that are unparalleled

3    in the industry.

4        5.        The Debtor has been an industry pioneer and leader, manufacturing and selling

5    its vehicles to limousine operators, dealerships, corporations, and individuals throughout the

6    world.  With sales at both the retail and dealer level, the Debtor has achieved a premium brand

7    within the industry, commands premium prices, and enjoys a reputation for quality, safety, and

8    excellence in design.  For example, the Debtor is one of the few manufacturers to voluntarily

9    conduct crash tests of its vehicles to ensure quality and safety.   The Debtor has further

10   differentiated itself from its rivals by being a premium designer and manufacturer that caters to

11   all phases of the luxury transportation industry.   The Debtor sells products in six main

12   categories:  Ford-Lincoln based limousines, shuttle buses, hearses, hybrid buses, limousine

13   buses, and SUV limousines.  Within the stretch limousine market, the Debtor currently has an

14   estimated 30% market share, and within the shuttle bus market, the Debtor currently has an

15   estimated 5% market share which is growing.

16       6.        The Debtor acquires most of the car chassis that form the core of its product

17   from Ford Motor Company ("Ford").  These purchases have historically been provided to the

18   Debtor pursuant to a purchasing line of credit (the "Ford Line") made available from Ford

19   Motor Credit ("Ford Credit") and additional lines of credit (the "Comerica Lines") made

20   available from Comerica Bank ("Comerica").

21       7.        Ford Credit and Comerica assert a security interest in, among other things, the

22   car chassis that Ford sells to the Debtor.  Ford Credit retains title documentation for each car

23   chassis as security until the car is delivered into Mexico where the process of converting the

24   vehicle into a limousine begins.  At the time that the car is transported into Mexico, Ford Credit

25   is paid for the car and title documentation for the vehicle is transferred to Comerica.  As each

26   finished limousine is then sold, Comerica releases the title documentation to the Debtor, and the

27   Debtor provides the same to the customer.

28

                                        19

1    8.    Similarly, Ford sells to the Debtor truck chassis. The truck chassis are not,
2  however, financed by Ford Credit. Instead, the Debtor and Ford are parties to a consignment
3  agreement whereby Ford retains title to the truck chassis until the truck chassis is transported to
4  Mexico. At the time the truck chassis is transported into Mexico, Ford is paid for the truck
5  chassis, and title documentation for the truck is transferred to Comerica. As each finished
6  specialty truck is then sold, Comerica releases the title documentation to the Debtor, and the
7  Debtor provides the same to the customer.

8  **B.    Circumstances That Led To The Chapter 11 Filing.**

9    9.    The Debtor showed consistent and formidable growth from its inception until
10 2007. After expanding to three facilities in the Southern California region, with more than 800
11 employees and almost $150 million in annual revenue, starting in 2007, the Debtor began to see
12 a drop in revenue caused as a result of various external factors which the Debtor has attempted
13 to counteract through the implementation of various cost-cutting measures.

14    10.    The overall downturn in the economy has had a significant impact on the
15 Debtor's industry. As consumers have reduced their use of luxury products such as limousines,
16 the Debtor's business has suffered. As a result of the decrease in the use of limousines,
17 replacing existing limousines has become less necessary for the Debtor's customers.
18 Accordingly, less orders have been placed, less limousines have been manufactured, and less
19 revenue has been generated. Due to the decrease in demand, revenue has decreased in the
20 industry as a whole, as manufacturers and sellers are willing to sell their product at discounted
21 rates.

22    11.    Indeed, in an effort to mitigate its losses caused by the decrease in demand due
23 to the economic recession, the Debtor has been forced to reduce sales prices on its existing
24 inventory. Additionally, due to a highly anticipated Ford-Lincoln Town Car body style
25 expected to be released, major customers of the Debtor have refrained from additional
26 purchases of existing models. Given the image-driven nature of the limousine industry,
27 particularly with up-scale clientele such as major Las Vegas hotel and casino chains which
28 purchase vehicles from the Debtor, there has been a degree of hesitancy to purchase new units,

20

1  as such clients have opted to wait for the release of newer models expected to be introduced in
2  2012.

3       12.    As a result of the foregoing, the Debtor's business has experienced significant
4  financial pressure. In 2008, revenues fell to approximately $100 million. This trend continued
5  through 2009, as the Debtor saw revenues fall to approximately $35 million.

6       13.    To help alleviate the financial strain being experienced by the Debtor, the
7  Debtor implemented various cost-cutting measures. First, the Debtor was compelled as a result
8  of the recession to reduce the number of its employees, from a high of approximately 800 in
9  2007, to currently approximately 100. Additionally, starting in 2009, the Debtor closed two of
10 its manufacturing locations in Southern California. Instead, the Debtor began to outsource a
11 majority of its vehicle manufacturing work to a sister company – Krystal International, S.A. DE
12 C.E. (a Mexican company) ("KI"). KI currently completes approximately 85% of each vehicle
13 in Mexico. The vehicle is then shipped to the United States where it is completed in the
14 Debtor's existing Southern California facility, and then sold. The Debtor pays KI for labor
15 costs and related expenses. Such outsourcing has allowed the Debtor to streamline its costs and
16 position itself to be a more profitable company, while ensuring exacting quality and safety.
17 The shift in manufacturing to KI has marked a strategic shift in the Debtor's overall business
18 model, as the Debtor has started to focus upon marketing and distribution while outsourcing
19 production to a less costly alternative source.

20      14.    Nevertheless, while these cost-cutting measures have helped the Debtor
21 reorganize its business, financial challenges are still prevalent in the industry and with the
22 Debtor's business.

23      15.    The Debtor currently suffers from a cash-flow crunch which the Debtor intends
24 to address with debtor-in-possession financing. Additionally, the Debtor has actively marketed
25 its business for sale for an extended period of time and has reached an agreement with a buyer,
26 which is affiliated with the entity that will be providing the Debtor with the necessary debtor-
27 in-possession financing. The Debtor intends to embark on an expedited sale process to sell its
28 business to the highest bidder.

21

C.    **The Debtor's Primary Assets And Primary Liabilities**.

16.    The Debtor's primary assets consist of: (a) vehicle and parts inventory; (b) equipment and tools; (c) accounts receivable; and (d) ownership interest in Edson Financial, Inc., which provides equipment and vehicle financing to, among others, customers of the Debtor.

17.    Petition Date consist of the following:

   a.    Pre-Petition Revolving Loans –$7,398,301.81.

   b.    Pre-Petition Installment Loan –$878,762.36.

   c.    Pre-Petition Swap Obligations –$42,000.

   d.    Pre-Petition L/C Obligations –$907,000.

   e.    Guaranties - The Debtor has also guarantied various loans and obligations as discussed in the Cash Collateral Stipulation

18.    As security for the Pre-Petition Revolving Loan, Pre-Petition Installment Loan, Pre-Petition Swap Obligations, Pre-Petition L/C Obligations, and Guaranties, Comerica asserts a first priority security interest in all of the Debtor's assets.

19.    The Debtor owes approximately $1,390,832 to Ford Credit pursuant to the Ford Line. Ford Credit asserts a security interest in the chassis which it financed and proceeds thereof.

20.    The Debtor has liabilities to trade creditors of approximately $2.6 million, various vehicle financing obligations and other miscellaneous liabilities, and potential liabilities in pending lawsuits, which are subject to insurance coverage.

D.    **Post-Petition Financing and Cash Collateral Budget.**

21.    Currently, the Debtor does not have access to sufficient funds to continue operations for more than a very short period of time, which is why the Debtor sought court approval of $2.5 million in debtor-in-possession financing. In addition, the Debtor has entered into a Cash Collateral Stipulation with Comerica (the "Cash Collateral Stipulation"). The Budget included with the Cash Collateral Stipulation assumes, among other things, that the Debtor will obtain debtor-in-possession financing in the amount of $2.5 million, which,

22

1   together with use of cash collateral as authorized by the Stipulation, will provide sufficient

2   funds for the Debtor to continue operation through early January 2011.  A copy of the Budget

3   included with the Cash Collateral Stipulation is attached hereto as Exhibit "3."

4   I declare that the foregoing is true and correct under penalty of perjury.

5        Executed this 24th day of November 2010 at Brea, California.

6

7   _____

8        WALTER BOWSER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23

## DECLARATION OF LAWRENCE R. PERKINS

I, Lawrence R. Perkins, hereby declare as follows:

1.      I am over 18 years of age. I am the President of El Molino Advisors, Inc. ("El Molino), financial advisor to Krystal Koach, Inc. (the "Debtor"), the Chapter 11 debtor and debtor in possession herein. I have been primary responsible person for El Molino's services to the Debtor since El Molino's retention as financial advisor in December 2009. Except where otherwise indicated, all statements herein are based on my own personal knowledge, and if called upon, I could and would testify to their truth.

2.      I make this Declaration in support of the Debtor's "Motion for Order Establishing Procedures for the Sale of Substantially all of the Debtor's Assets, Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 105 and 363 of the Bankruptcy Code and Granting Related Relief" (the "Motion").

3.      The Debtor and El Molino have made extensive efforts to expose the Debtor's business and assets to potential acquisition partners. Beginning prior to El Molino's retention, the Debtor had retained a business broker for several years to explore interest in a strategic partner or buyer. In December 2009 the Debtor retained El Molino Advisors, Inc. as financial advisor. In March and April 2010, the Debtor commenced a more orderly process of actively identifying potentially interested parties and inquiring as to their interest.

4.      This process intensified in early September 2010.   El Molino circulated investment and information memoranda containing facts, projections and other relevant information. El Molino arranged for and assembled an electronic data room which was made available to interested buyers or strategic investors.   The information made available in this form included financial statements, detailed financial records, appraisals, customer lists, backlog reports and other information to facilitate the decision making process for a buyer.

5.      El Molino directly contacted in excess of 20 potentially interested parties, including competitors, industry players and distressed market investors. Although the Debtor reached a tentative understanding with the Buyer's affiliate in late September 2010, these marketing efforts continued and resulted in expressions of interest. However, none of the

24

1  expressions of interest indicated a level of value to the Debtor equal to that offered by the
2  Buyer.

3       6.     In the course of seeking interest and making available information regarding the
4  Debtor's business and assets, El Molino also made available information regarding the related
5  companies Imperial Highway, LLC ("Imperial"); Krystal Enterprises, LLC ("Enterprise"); and
6  Enterprise's subsidiary, KI.   Imperial owns and leases to the Debtor the Debtor's headquarters
7  building.  As discussed above, KI performs much of the manufacturing work in Mexico to
8  create the Debtor's product.   All of the parties contacted were made aware that all of the
9  related assets could be made a part of any transaction. El Molino will continue to provide such
10 related entity information in responding to interested parties in accord with the Sale Procedures
11 discussed below.

12      7.     The foregoing marketing efforts have produced an agreement to purchase the
13 Acquired Assets pursuant to the terms set forth in that certain Asset Purchase Agreement (the
14 "Purchase Agreement") between the Debtor and Krystal Infinity, LLC (the "Buyer"), dated
15 November 19, 2010, a copy of which is attached hereto as Exhibit "2."

16      I declare that the foregoing is true and correct under penalty of perjury.

17      Executed this 24th day of November 2010 at Los Angeles, California.

20      LAWRENCE R. PERKINS

25

1          **DECLARATION OF PHILIP A. GASTEIER**

2          I, PHILIP A. GASTEIER, hereby declare as follows:

3          1.      I am a partner of Levene, Neale, Bender, Yoo & Brill, LLP, general insolvency

4   counsel to **KRYSTAL KOACH, INC.**, the debtor and debtor in possession ("Debtor") in the

5   above-entitled Chapter 11 bankruptcy case. Unless otherwise set forth herein, I have personal

6   knowledge of the facts set forth herein and, if called to testify, would and could competently

7   testify thereto.

8          2.      I make this Declaration in support of the Debtor's "Motion for Order

9   Establishing Procedures for the Sale of Substantially all of the Debtor's Assets, Free and

10  Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 105 and

11  363 of the Bankruptcy Code and Granting Related Relief" (the "Motion").

12         3.      Attached hereto as Exhibit "1" is a copy of proposed Sales Procedures which

13  have been approved by counsel for Comerica Bank and Counsel for Krystal Infinity, LLC (the

14  "Lead Bidder."

15         4.      A Stipulation (the "Cash Collateral Stipulation") between the Debtor and

16  Comerica Bank was approved by the Court on an interim basis by Order entered November

17  24, 2010. The Cash Collateral Stipulation requires that the Debtor file a motion to approve

18  the bidding procedures for the sale of all or substantially all of the Debtor's assets under

19  Section 363 of the Bankruptcy Code within five (5) business days following the Petition Date;

20  obtain entry of an order approving the sale, on terms acceptable to Comerica, on or before

21  January 10, 2011; and consummate the sale on or before January 25, 2011. Correspondingly,

22  the DIP Financing Agreement requires that the Debtor obtain entry of an order approving the

23  sale on or before January 12, 2011 and close the sale on or before January 26, 2010.

24         5.      Pursuant to the Cash Collateral Stipulation, any order approving the sale of

25  assets of the Debtor in this case shall provide for the payment of the sale proceeds at closing,

26  as follows: First, (A) to Comerica in the amount of the Pre-Petition Loans, Pre-Petition Swap

27  Obligations, Pre-Petition L/C Obligations (except to the extent such obligations have

28  previously been repaid or are assumed by the purchaser in a transaction acceptable to

26

1    Comerica, and (B) to any other senior lien holder (whose collateral is being sold pursuant to

2    such sale) the value of such senior lien holder's allowed secured claim (except to the extent

3    such obligations are assumed by the purchaser); second, to the Debtor $500,000 (the "Estate

4    Funds"), which Estate Funds shall remain with the Debtor's estate to be used to fund the wind

5    down of the Debtor's estate and to distribute the remaining balance to claim holders in

6    accordance with their priorities under the Bankruptcy Code under what is expected to be a

7    liquidating plan of reorganization, with Comerica agreeing that the Estate Funds shall be free

8    and clear of any of Comerica's liens; third, to the debtor-in-possession financing lender in an

9    amount equal to the outstanding amounts due under the applicable debtor-in-possession

10    financing documents; fourth, to Comerica in the amount of the remaining Pre-Petition

11    Obligations; and fifth, to the Debtor.

12        6.    I was principally responsible for representation of the Debtor in connection

13    with negotiations with the Lead Bidder on the Asset Purchase Agreement and Sale

14    Procedures. The Sale Procedures and the Asset Purchase Agreement, including the Breakup

15    Fee, as defined in the Sale Agreement, were the subject of lengthy negotiations involving the

16    Lead Bidder's counsel and other parties. The Debtor is advised that the lead Bidder has

17    incurred significant fees and costs in connection with such negotiations.

18        I declare that the foregoing is true and correct under penalty of perjury.

19        Executed this 24th day of November 2010 at Los Angeles, California.

20

21                                      /s/ Philip A. Gasteier

22                                      PHILIP A. GASTEIER

23

24

25

26

27

28

# EXHIBIT "1"

## KRYSTAL KOACH PROPOSED SALE PROCEDURES

1. El Molino Advisors, Inc ("El Molino"), which is serving as the Debtor's financial advisor and marketing consultant, shall continue to seek and respond to interested purchasers based on the marketing information previously assembled by El Molino, including an electronic "data room" which contains customary information about the Debtors' business. El Molino will share this information, and such other information as may reasonably be requested, with any prospective buyer who executes a confidentiality agreement (which can be obtained from El Molino) and who demonstrates to El Molino that the prospective buyer has the reasonable financial ability to participate in an auction sale process within the required time frame. To the extent that viable prospective buyers desire to obtain additional financial information from the Debtor beyond the information that El Molino compiled, El Molino will make every reasonable effort to facilitate providing that additional information to the prospective buyer.

**Interested parties should contact Lawrence Perkins of El Molino as follows:**

**Lawrence Perkins**

**Email: lperkins@elmolinoinc.com**

**Phone: 213-291-2547**

2. The actual auction sale (the "Auction") will take place on Tuesday, January 4, 2011 (or two business days prior to the sale hearing date, whichever is later) commencing at 10:00 a.m. at 10250 Constellation Boulevard, 17th Floor, Los Angeles, California 90067 or such other location as determined by El Molino to be in the best interests of the Debtor's estate.

3.      Substantially all of the Debtors' assets are available to be purchased, free

and clear of all liens, claims and interests, except for those assets which are designated as

"Excluded Assets" in the Asset Purchase Agreement (the "Lead Bidder APA") between

the Debtor and Krystal Infinity, LLC, a Nevada Limited Liability Company (the "Lead

Bidder").

4.      In order to be eligible to participate in the auction sale, a prospective

bidder will be required to do the following: (a) Not less than twenty-four hours prior to

the Auction, deliver a deposit in clear funds in the amount of $500,000 (the "Deposit") to

the Debtors' bankruptcy counsel which will be held in a segregated account and which

will be non-refundable in favor of the Debtor's bankruptcy estate if the bidder is deemed

to be the winning bidder at the auction sale, has its bid (and the Debtor's corresponding

asset sale) approved by the Bankruptcy Court, and fails to close its purchase of the

Debtor's assets in a timely manner; (b) be deemed to be financially qualified to

participate in the auction sale by El Molino, the Debtor and secured creditor Comerica

Bank (the "Bank"), with the Bankruptcy Court to be the forum to resolve any disputes in

this regard; (c) deliver to El Molino, counsel for the Bank and counsel for the Debtor, not

less than twenty-four hours prior to the Auction, a written markup of the Lead Bidder

APA showing any proposed changes the buyer has to the Lead Bidder APA, which can

be obtained from El Molino; (d) either in the markup of the Lead Bidder APA, or

separately, deliver to El Molino, counsel for the Bank and counsel for the Debtor, not less

than twenty-four hours prior to the Auction, a written statement demonstrating a

willingness to make an offer with total value in an amount at least equal to the sum of (x)

the value offered by the Lead Bidder; plus (y) the Breakup Fee identified in paragraph 9

below ($300,000), plus (z)  $100,000 (such sum being referred to herein as the
"Minimum Overbid Amount") (which shall be deemed the bidder's offer to purchase);
and (e) deliver to El Molino, counsel for the Bank and counsel for the Debtor, not less
than twenty-four hours prior to the Auction,  (i) a written statement identifying any
connection the prospective bidder has to any member of the Debtor's Board of Directors
or senior management at the time the deposit is delivered or, if the connection arises
thereafter, as soon as the connection becomes known ;  (ii) information as to the identity
of the bidder, including if a corporate or other business entity, the identity of the
principals of the bidder entity; and (iii) current financial statements of the prospective
buyer, or such other form of financial disclosure acceptable to the Debtor, El Molino and
the Bank demonstrating the prospective bidder has sufficient financial resources to close
the sale by January 25, 2010. The submitted APA must not contain any contingencies to
the validity, effectiveness and/or binding nature of the offer, including without limitation,
contingencies for financing, due diligence or inspection.

     5.    If more than one qualified bidder complies with the requirements of
paragraph 4 above and appears at the auction sale, El Molino will randomly assign
bidding numbers to the bidders. The following is how the bidding will work by example
if there are three qualified bidders at the auction sale.  The bidder who is assigned
bidding #1 will be required to submit the first bid, unless the Lead Bidder is assigned
bidding #1, in which case the bidder who is assigned bidding #2 will be required to
submit the first bid. If the first bid is not equal to or greater than the Minimum Overbid,
the initial bidder shall be out and the bidding will pass to the next sequential number until
a qualified bid is received. Once a bid equal to or greater than the Minimum Overbid is

received, that bid will be deemed a qualified bid and the bidding will then proceed to the
bidder with the next sequential number.  That next bidder will then be required to submit
a bid which is at least $100,000 higher than the qualified bid submitted by the first bidder
or drop out of the auction sale.  The bidding will then turn to the bidders with the next
sequential numbers and then back to bidder #1 and continue (with bidding increments of
at least $100,000) until all bidders but one have dropped out of the auction sale at which
point the bidder who made the highest bid will be deemed the highest bidder, subject to
the Bank's credit bid rights.  Once a bidder elects not to make a bid which is at least
$100,000 higher than the previously made qualifying bid, the bidder will be deemed to
have dropped out of the auction and will not be permitted back into the auction thereafter.
If the Bank does not exercise its credit bid rights, the bidder who submitted the second
highest bid at the auction sale will be deemed to constitute the winning backup bidder.
The Lead Bidder shall not in any manner be deemed the back up bidder unless it
specifically agrees to said status in writing.

      6.     Notwithstanding any other provision of this Order, the Debtor and the
Bank shall collectively decide which bid made at the auction is the highest and best bid
for the Debtors' estates with the greatest weight to be given to the amount of cash
consideration being received, with any disagreement to be resolved by the Bankruptcy
Court.

      7.     The Debtor's sale of assets to the winning bidder (or the winning backup
bidder if the winning bidder fails to close its purchase in a timely manner) shall be made
on an "AS IS WHERE IS" basis with no representations or warranties other than those
representations and warranties which are specifically provided for in the asset purchase

agreement submitted by the winning bidder (or the winning backup bidder if the winning

bidder fails to close its purchase in a timely manner).

     8.     The date and time of the hearing for the Bankruptcy Court to consider

approval of the Debtor's sale of assets to the winning bidder at the auction sale (as well

as any request by the Debtor to assume and assign to the winning bidder any of the

Debtor's executory contracts and unexpired leases that the winning bidder wishes to have

assigned to it) will be January __, 2011 at 10:00 a.m.  Subject only to entry by the

Bankruptcy Court of the sale order, the winning bidder will have until January 25, 2011

to consummate the sale. If the winning bidder fails to do so, the winning bidder will be

deemed to have forfeited its $ Deposit unless the Bankruptcy Court or the Debtors and

the Bank agree to provide the winning bidder an extension of time to close. If the

winning bidder fails to close and forfeits its Deposit, the winning back up bidder will be

notified and will then have fifteen days to close its purchase of the Debtor's assets or will

be deemed to have forfeited its deposit unless the Bankruptcy Court or the Debtor and the

Bank agree to provide the winning backup bidder an extension of time to close. The

Deposit of the backup bidder will be retained by the Debtor following the conclusion of

the auction sale and will be returned to the backup bidder on the earlier to occur of (i) the

closing by the winning bidder of its purchase of the Debtor's assets or (ii) January 26,

2011 provided the winning bidder has closed its purchase of the Debtor's assets by that

date.

     9.     In the event that a competing bid to acquire all or a substantial part of the

Assets is approved by the Court (an "Alternative Transaction") and the Lead Bidder is not

the purchaser of the Acquired Assets as a result, the Lead Bidder shall be entitled to be

33

paid an amount equal to the reasonable expenses incurred by Buyer's representatives,

agents, employees and attorneys and professionals in connection with its investigation,

negotiation, structuring and financing of the Sale (including, but not limited to, legal,

accounting, consulting, auditing, and financial advisory fees) in an amount up to and

including $300,000 (the "Break-Up Fee"), provided that, the Break-Up fee shall only be

payable if (a) the Lead Bidder agrees in writing at the Auction to be the backup bidder,

and (b) the Alternative Transaction closes.  The Break-Up Fee shall be paid from the sale

proceeds at the Closing of the Alternative Transaction, or as soon thereafter as any

dispute regarding the amount of the Breakup Fee is fully resolved, with such payment to

be free and clear of all claims, liens and interests in or on the property of the Debtor or

the Bankruptcy Estate. An amount equal to the maximum Breakup Fee of $300,000 shall

be set aside from the sale proceeds of the Alternative Transaction until the amount of the

Breakup Fee is determined.  Any balance of the $300,000 remaining after payment of the

Breakup Fee shall be distributed in accord with the Cash Collateral Stipulation between

the Debtor and the Bank.

   10. All Qualified Bidders shall be deemed to have consented to the core

jurisdiction of the Bankruptcy Court and to have waived any right to a jury trial in

connection with any disputes relating to the Auction and/or the Sale. All asset purchase

agreements shall be governed by and construed in accordance with the laws of the State

of California. All Qualified Bidders shall be bound by their bids until conclusion of the

Auction.

   11. The bidding procedures set forth herein (other than those provisions

governing the Breakup Fee and bid increments) may be modified without any further

order of the Bankruptcy Court provided that the Debtors and the Bank agree to such modifications.    Any dispute over any such modifications shall be resolved by the Bankruptcy Court.

# EXHIBIT "2"

# ASSET PURCHASE AGREEMENT

## By and Between

## KRYSTAL KOACH, INC.,

## AS SELLER,

## And

## KRYSTAL INFINITY, LLC ,

## AS BUYER

Dated as of November **19**, 2010

15277870

37

## TABLE OF CONTENTS

**Page**

**ARTICLE 1 PURCHASE AND SALE OF THE ACQUIRED ASSETS**................................6

    1.1.    Transfer of Acquired Assets.................................................................6

    1.2.    Excluded Assets........................................................................7

    1.3.    Assumption of Liabilities...........................................................7

    1.4.    Excluded Liabilities..................................................................7

**ARTICLE 2 CONSIDERATION** .................................................................7

    2.1.    Consideration.........................................................................7

**ARTICLE 3 CLOSING AND DELIVERIES** .................................................8

    3.1.    Closing................................................................................8

    3.2.    Seller's Deliveries..................................................................8

    3.3.    Buyer's Deliveries...................................................................9

    3.4.    Post-Closing Responsibilities.....................................................10

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER**..........................10

    4.1.    Corporate Organization............................................................10

    4.2.    Authorization and Validity........................................................10

    4.3.    No Conflict or Violation...........................................................10

    4.4.    Consents and Approvals...........................................................10

    4.5.    Compliance with Law..............................................................11

    4.6.    Litigation .............................................................................11

    4.7.    Permits................................................................................11

    4.8.    Employee Benefits..................................................................11

i

4.9.   Title to Assets; Sufficiency ............................................................. 11

4.10.   Business Records ...................................................................... 11

4.11.   Employees ............................................................................ 11

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER** ............................ 11

5.1.   Corporate Organization ................................................................. 11

5.2.   Authorization and Validity .............................................................. 12

5.3.   No Conflict or Violation ............................................................... 12

5.4.   Availability of Funds .................................................................. 12

5.5.   Adequate Assurances Regarding Assigned Contracts ......................................... 12

**ARTICLE 6 COVENANTS OF SELLER** ................................................................ 12

6.1.   Conduct of Business Before the Closing Date ................................................ 12

6.2.   Obligations of Seller after Entry of Sale Order ............................................. 13

6.3.   Access to Properties and Records; Confidentiality ........................................... 13

6.4.   Further Assurances ..................................................................... 14

**ARTICLE 7 COVENANTS OF BUYER** ................................................................. 14

7.1.   Actions Before Closing Date ............................................................ 14

7.2.   Adequate Assurances .................................................................... 14

7.3.   Cure of Defaults ....................................................................... 14

7.4.   Availability of Business Records ......................................................... 15

7.5.   Buyer Obligation to Perform; Cooperation with Seller Enforcement of Rights. ............................................................................ 15

7.6.   Further Assurances ..................................................................... 15

**ARTICLE 8 BANKRUPTCY PROCEDURES** ............................................................ 15

8.1.   Bankruptcy Actions .................................................................... 15

ii

8.2. Bidding Procedures ........................................................................... 16

8.3. Approval ......................................................................................... 16

**ARTICLE 9 EMPLOYEE AND BENEFITS MATTERS** ..................................... 16

9.1. Offers of Employment ...................................................................... 17

9.2. Severance ....................................................................................... 17

9.3. Employment At Will ......................................................................... 17

9.4. Employee Benefit Plans .................................................................... 17

9.5. COBRA Obligations ......................................................................... 17

**ARTICLE 10 TAXES AND FEES** ..................................................................... 17

10.1. Taxes Related to Purchase of Assets ............................................... 17

10.2. Cooperation on Tax Matters ........................................................... 18

10.3. Allocation of Purchase Price and Purchase Price Allocation Forms .............. 18

10.4. Unbilled Transactional Taxes ........................................................... 18

**ARTICLE 11 CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES** .......... 18

11.1. Conditions Precedent to Performance by Seller and Buyer ................. 18

11.2. Conditions Precedent to Performance by Seller ................................ 19

11.3. Conditions Precedent to the Performance by Buyer .......................... 20

11.4. Waiver of Condition; Frustration of Conditions ................................ 21

**ARTICLE 12 TERMINATION AND EFFECT OF TERMINATION.** ...................... 21

12.1. Right of Termination ...................................................................... 21

12.2. Termination Without Default .......................................................... 21

12.3. Effect of Failure of Seller's Conditions to Closing ............................ 22

12.4. Effect of Failure of Buyer's Conditions to Closing ............................ 22

iii

**ARTICLE 13 ADDITIONAL AGREEMENTS** ........................................................... 23

13.1.   Litigation Support ........................................................... 23

13.2.   Cancellation of Accounts from Seller ........................................ 23

13.3.   Insurance Matters ...................................**Error! Bookmark not defined.**

**ARTICLE 14 MISCELLANEOUS** ........................................................... 23

14.1.   Successors and Assigns ........................................................... 23

14.2.   GOVERNING LAW; JURISDICTION ............................................. 24

14.3.   Mutual Disclosures ........................................................... 24

14.4.   Warranties Exclusive ........................................................... 25

14.5.   Survival of Representations and Warranties ...................................... 26

14.6.   Mutual Drafting ........................................................... 26

14.7.   Waiver of Bulk Sales Laws ........................................................... 26

14.8.   Expenses ........................................................... 26

14.9.   Severability ........................................................... 26

14.10.  Notices ........................................................... 27

14.11.  Amendments; Waivers ........................................................... 28

14.12.  Public Announcements ........................................................... 28

14.13.  Entire Agreement ........................................................... 28

14.14.  Parties in Interest ........................................................... 28

14.15.  DAMAGES ........................................................... 28

14.16.  WAIVER OF JURY TRIAL ........................................................... 29

14.17.  Headings ........................................................... 29

14.18.  Construction ........................................................... 29

iv

14.19. Currency ................................................................................................29

14.20. Time of Essence ......................................................................................29

14.21. Counterparts ............................................................................................29

**ARTICLE 15 DEFINITIONS** ............................................................................30

15.1. Certain Terms Defined .............................................................................30

**SCHEDULES**

Schedule 1.3      Assumed Liabilities

Schedule 4.6      List of pending litigation matters

Schedule 15.1     Acquired Assets

Schedule 15.2     Assigned Contracts

**EXHIBITS**

Exhibit A      Bill of Sale

Exhibit B      Assignment and Assumption Agreement

Exhibit C      Patent Assignment

Exhibit D      Marks Assignment

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "*Agreement*"), dated as of November 19, 2010, is made by and between Krystal Koach, Inc., a California corporation ( "*Seller*"), Krystal Infinity, LLC, a Nevada limited liability company ("*Buyer*"). Buyer and Seller, are sometimes referred to in this Agreement, individually as a "*Party*" and collectively as the "*Parties.*" Capitalized terms used in this Agreement are defined either when first used in this Agreement or in Section 15.

## BACKGROUND INFORMATION

WHEREAS, on November 19, 2010, Seller intends to file a voluntary petition for relief under the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California;

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, all of Seller's right, title and interest in and to the Acquired Assets, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, Sections 363 and 365 of the Bankruptcy Code;

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, Buyer shall also assume, and Seller shall assign and transfer to Buyer the Assumed Liabilities;

WHEREAS, Seller has approved this Agreement and the transactions contemplated hereby (including the purchase and sale of the Acquired Assets and the assumption by Buyer of certain Assumed Liabilities) upon the terms and conditions set forth in this Agreement;

WHEREAS, the manager of Buyer has approved this Agreement and the transactions contemplated hereby (including the purchase and sale of the Acquired Assets and the assumption by Buyer of the Assumed Liabilities) upon the terms and conditions set forth in this Agreement; and

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and undertakings herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Seller and Buyer hereby agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF THE ACQUIRED ASSETS

1.1.     Transfer of Acquired Assets  At, and effective as of, the Closing, and upon the terms and conditions set forth in this Agreement, Seller shall sell, assign, transfer and convey to Buyer, and Buyer shall purchase and accept from Seller, all of Seller's right, title and interest in the Acquired Assets, free and clear of all liens, claims and interests in accordance with 11 U.S.C. § 363 (f).

6

1.2.     Excluded Assets. Notwithstanding anything to the contrary in this Agreement (including Section 1.1), the Acquired Assets shall not include: (a) the Excluded Assets or any right, property or interest in property not expressly included in the Acquired Assets; (b) Contracts of Seller that are not listed on Schedule 15.2; or (c ) any bank account of Seller solely to the extent it contains proceeds of the sale contemplated by this Agreement.

1.3.     Assumption of Liabilities. At, and effective as of, the Closing, Seller shall assign, transfer, and convey to Buyer, and Buyer shall irrevocably assume and agree to faithfully pay, perform, discharge and fulfill, and if applicable, comply with, all of the Assumed Liabilities in accordance with their respective terms. For purposes of this Agreement, "*Assumed Liabilities*" shall mean only those Obligations of Seller that (i) are listed in Schedule 1.3 hereto; (ii) arise after Closing as to Assigned Contracts; and (iii) otherwise arise after Closing in connection with the Acquired Assets. Nothing herein obligates Buyer to assume any other Obligations of Seller other than the Assumed Liabilities.

1.4.     Excluded Liabilities. In addition to any other liabilities not specifically assumed according to Section 1.3 and Schedules 1.3 and 15.2, Seller shall retain the following liabilities (the "*Excluded Liabilities*"): (a) the Retained Litigation; [(b) Obligations of Seller with respect to intercompany accounts payable with any Affiliates of Seller; (c) Obligations directly and solely arising in connection with Excluded Assets; (d) any Obligations that Seller has agreed to pay or perform pursuant to this Agreement or any Ancillary Agreement; (e) Obligations of Seller in respect of indebtedness for borrowed money except for those Assumed Liabilities identified in Schedule 1.3 and Assigned Contracts identified in Schedule 15.2; (f) Taxes of Seller computed on the basis of income, receipts and/or payroll in existence prior to the Closing Date except for those identified in Schedule 1.3; and (g) any obligations or liabilities of Seller arising prior to the Closing except for those Assumed Liabilities identified in Schedule 1.3 and Assigned Contracts identified in Schedule 15.2.

### ARTICLE 2
### CONSIDERATION

2.1.     Consideration.

(a)     The consideration for the purchase of the Acquired Assets shall consist of (i) the assumption by Buyer of the Assumed Liabilities and (ii) the payment to Seller of the sum of nine million dollars ($9,000,000) (the "*Cash Payment*"), against which shall be credited the balance owed on the DIP Loan at the Closing in accordance with Section 3.3 (collectively the "*Purchase Price*").

(b) Except as specifically provided herein or agreed at Closing, Seller shall receive the benefit of all monies actually received as of 11:59 p.m. PST on the day prior to the Closing Date and shall be responsible for all expenses, costs and Liabilities allocable to the ownership and conduct of Seller Business for the period prior to 11:59 p.m. PST on the day prior to the Closing Date, and Purchaser shall receive the benefit of all monies actually received after the Closing and shall be responsible for all expenses, costs and Liabilities allocable to the ownership and conduct of Seller Business after 11:59 p.m. PST of the day prior to the Closing Date.

7

## ARTICLE 3
## CLOSING AND DELIVERIES

3.1.        Closing.

The sale, transfer, assignment and delivery by Seller of the Acquired Assets to Buyer and the assumption by Buyer of the Assumed Liabilities, on terms and subject to the conditions set forth in this Agreement, will be effected on the Closing Date (the "*Closing*") and will take place at the offices of *Levene, Neale, Bender, Yoo & Brill L.L.P.*, 10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067 at 10:00 a.m. prevailing local time on the third Business Day immediately following the satisfaction or waiver by the appropriate Party of all the conditions contained in Article 11 (other than conditions which by their terms or their nature are to be performed or measured as of the Closing Date (provided such conditions are satisfied at Closing or waived by the applicable Party)), or on such other date or at such other place and time as may be agreed to by the Parties (the "*Closing Date*").  On the Business Day immediately prior to the Closing Date, Buyer and Seller shall conduct a pre-Closing at the same location as the Closing, commencing at 11:00 a.m. local time, at which each Party shall present for review by the other Parties copies in execution form of all documents required to be delivered by such Party at or in connection with the Closing. Each Party will, and will cause its Affiliates to, at the Closing execute and deliver the agreements, documents, certificates and other deliveries (including the Ancillary Agreements) required to be executed and/or delivered at the Closing by such Party and/or such Affiliates of such Party or for which such execution and/or delivery is a condition to another Party's obligations to consummate the Closing.

3.2      Seller's Deliveries.   At the Closing, Seller shall deliver the following documents consistent, with the terms of this Agreement:

(a) a bill of sale with respect to the Acquired Assets, duly executed by Seller and in a commercially reasonable form acceptable to Seller and Buyer, substantially in the form attached hereto as Exhibit "A";

(b) an assignment and assumption agreement with respect to any Assigned Contracts and Assumed Liabilities, duly executed by Seller and in a commercially reasonable form acceptable to Seller and Buyer, substantially in the form attached hereto as Exhibit "B" (the "Assignment and Assumption Agreement") ;

(c ) an assignment of patents with respect to any patents included in the Acquired Assets, substantially in the form attached hereto as Exhibit "C" (the "Patent Assignment");

(d) an assignment of trademarks with respect to any trademarks included in the Acquired Assets, substantially in the form attached hereto as Exhibit "D" (the "Marks Assignment");

8

(e) assignment of stock for Seller's shares in Edson Financial, Inc., a California corporation, and Imperial Highway, LLC, in form and substance acceptable to Buyer;

(f) possession of the Business Records in Seller's possession or control (it being understood that any Business Records located at either Seller's Brea, California office site need not be physically delivered, but will be deemed delivered at the Closing); provided that, for any Business Records not located at this office site, Seller may deliver such Business Records to Buyer promptly after the Closing Date, but in no event later than fifteen (15) days after the Closing Date;

(g) such additional certificates of title, assignments of contracts and other instruments of transfer, conveyance and assignment as reasonably required by Buyer to be necessary to evidence the transfer, conveyance and assignment of Seller's right, title and interest in and to the Acquired Assets to Buyer (collectively, the "*Additional Asset Conveyance Documents*");

(h) such additional assignments of contracts and other instruments of assumption as reasonably required to evidence the valid and effective assumption by Buyer of the Assumed Liabilities (collectively, the "*Additional Liabilities Assumption Documents*");

(i) a secretary's certificate, in a commercially reasonable form acceptable to Buyer, certifying as to resolutions duly and unanimously adopted by Seller's board of directors approving and authorizing this Agreement and the transactions contemplated by this Agreement; and

(j) the Sale Order.

3.3  Buyer's Deliveries.

(a) At or prior to Closing, Buyer shall pay to Seller's bankruptcy estate the Cash Payment, reduced by the balance due on the DIP Loan , by wire transfer of immediately available funds to an account designated by Seller; and

(a) At or prior to Closing, Buyer shall deliver the following documents consistent with the terms of this Agreement: (i) the Assignment and Assumption Agreement, duly executed by Buyer;(ii)  the Patent Assignment; (iii)  the Marks Assignment; (iv) a secretary's certificate, in a commercially reasonable form acceptable to Seller, certifying as to resolutions duly and unanimously adopted by Buyer's manager and members approving and authorizing this Agreement and the transactions contemplated by this Agreement; (v) each of the Additional Asset Conveyance Documents and Additional Liabilities Assumption Documents; and (vi) evidence of cancellation of all amounts owing by Seller under the DIP Loan.

9

3.4 <u>Post-Closing Responsibilities</u>.

(b)      Upon presentation and at the request of Buyer, following the Closing Seller shall execute and deliver such Additional Asset Conveyance Document as reasonably required by Buyer to be necessary to evidence the transfer, conveyance and assignment of Seller's right, title and interest in and to the Acquired Assets to Buyer.

(c)      Upon presentation and at the request of Seller, following the Closing Buyer shall execute and deliver such Additional Liabilities Assumption Document as reasonably required to evidence the valid and effective assumption by Buyer of the Assumed Liabilities.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller hereby represents and warrants to Buyer on the date hereof as follows:

4.1.      <u>Corporate Organization</u>.  Seller and Edson Financial, Inc., Seller's wholly owned subsidiary, are duly organized and validly existing under the Laws of the State of California.  Subject to any necessary authority from the Bankruptcy Court, Seller has all requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted.

4.2.      <u>Authorization and Validity</u>.  Subject to the Bankruptcy Court's entry of the Sale Order, Seller has all requisite corporate power and authority to enter into this Agreement and the Ancillary Agreements to which it is or will be a party and to carry out its obligations hereunder and thereunder.  Subject to the Bankruptcy Court's entry of the Sale Order, the execution and delivery of this Agreement and the Ancillary Agreements by Seller and the performance by Seller of its obligations hereunder has been duly authorized, and no other organizational or corporate proceeding on the part of Seller is necessary to authorize such execution, delivery and performance.  This Agreement has been, and the Ancillary Agreements, when delivered, will be duly executed by Seller and, subject to the Bankruptcy Court's entry of the Sale Order, constitute or will constitute its valid and binding obligation, enforceable against it in accordance with the terms herein and therein.

4.3.      <u>No Conflict or Violation</u>.  Subject to entry of the Sale Order, the execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements, and the operation of the Business by Buyer as it is constituted as of the Closing Date, do not and will not (a) violate or conflict with any provision of the Certificate of Incorporation or Bylaws of Buyer and (b) violate any provision of Law, or any Order applicable to Buyer, nor will they result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contract to which Buyer is a party, by which it is bound or to which any of its properties or assets is subject.

4.4.      <u>Consents and Approvals</u>.  Other than Consents relating to and as may result from the Chapter 11 Case, to Seller's Knowledge no Consent or filing or registration

10

with any Government is required in connection with the execution and delivery of this Agreement by Seller and the Ancillary Agreements by Seller or the performance by Seller of its obligations hereunder by Seller or under the Ancillary Agreements, in any such case the failure of which to obtain would reasonably be expected to have a Material Adverse Effect.

       4.5.     Compliance with Law.  To Seller's knowledge, Seller maintains all licenses, governmental certifications and approvals required by law for Seller to operate the Business, and all of such licenses, governmental certifications and approvals are in effect and have not expired, or been revoked or suspended.

       4.6.     Litigation.  All known litigation matters pending against Seller are listed on Schedule 4.6 hereto. As provided herein and as will be provided for in the Sale Order, the Acquired Assets are expressly being sold to Buyer free and clear of all liens, claims and encumbrances of any kind. Accordingly, to Seller's Knowledge, there are no Claims, suits or proceedings pending or, to the Knowledge of Seller, threatened in writing, before any Government, brought by or against Seller, including the Claims listed in Schedule 4.6 hereto, that could reasonably be expected to have a Material Adverse Effect or materially impair the ability of Seller to consummate the transactions contemplated by this Agreement or the Ancillary Agreements, if determined adversely to Seller.

       4.7.     Permits.  [Intentionally Deleted.]

       4.8.     Employee Benefits.  [Intentionally Deleted.]

       4.9.     Title to Assets; Sufficiency.  Seller has title to all the property constituting the Acquired Assets. Except for the Excluded Assets, the personal property which Buyer will own, lease, license or otherwise have a valid right to use as of immediately after the Closing (without regard to any action taken by or at the direction of Buyer or any business plan of Buyer) will consist of all of the material personal property used in the operation of the Business by Seller as conducted by Seller as of the date of this Agreement.

       4.10.     Business Records.  Seller has made, or will make, available to Buyer copies of those Business Records that are in Seller's possession or control.

       4.11.     Employees.  [Intentionally Deleted.]

### ARTICLE 5
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows.

       5.1.     Corporate Organization.  Buyer is a Nevada limited liability company, duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation, and has all requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted.

11

5.2.    <u>Authorization and Validity</u>.  Buyer has all requisite power and authority to enter into this Agreement and to execute and deliver any Ancillary Agreement to which it is or will be a party and to carry out its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Ancillary Agreements and the performance of Buyer's obligations hereunder and thereunder have been duly authorized by all necessary action by the board of directors of Buyer, and no other proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance.  This Agreement has been, and the Ancillary Agreements, when delivered, will be duly executed by Buyer and do and will constitute its valid and binding obligation, enforceable against it in accordance with the terms herein and therein, except that such enforceability (a) may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity.

5.3.    <u>No Conflict or Violation</u>.    The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements, and the operation of the Business by Buyer as it is constituted as of the Closing Date, do not and will not (a) violate or conflict with any provision of the Certificate of Incorporation or Operating Agreement of Buyer and (b) violate any provision of Law, or any Order applicable to Buyer, nor will they result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contract to which Buyer is a party, by which it is bound or to which any of its properties or assets is subject.

5.4.    <u>Availability of Funds</u>.  Buyer has, and on and after the Closing Date will have, sufficient funds available to finance and consummate the transactions contemplated by this Agreement and to perform its obligations hereunder.  Immediately after giving effect to the transactions contemplated hereby, Buyer shall be able to pay its debts as they become due and shall own property which has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities).  Immediately after giving effect to the transactions contemplated hereby, Buyer will have adequate capital to carry on its businesses.

5.5.    <u>Adequate Assurances Regarding Assigned Contracts</u>.  Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

### ARTICLE 6
### COVENANTS OF SELLER

Seller hereby covenants to Buyer as follows:

6.1.    <u>Conduct of Business Before the Closing Date</u>.  Without the prior written consent of Buyer or the authorization of the Bankruptcy Court after notice and a hearing, between the date hereof through the earlier of the Closing Date or the date this Agreement is terminated in accordance with its terms, Seller shall not, except as required or expressly permitted pursuant to the terms hereof or of any Ancillary Agreement, (i) except in the Ordinary Course of Business (taking into account business exigencies arising as a result of Seller's

12

financial condition and Chapter 11 bankruptcy case) or as required by Law or contractual obligations or other agreements existing on the date hereof, increase in any manner the compensation of, or enter into any new bonus, incentive, employee benefits, severance or termination agreement or arrangement with, any of the Business Employees, or (ii) purchase substantially all the assets of or otherwise acquire any business or any corporation, partnership, association or other business organization or division thereof. Without limiting the generality of the foregoing, except as may be required by the Bankruptcy Court, from the date hereof until the earlier to occur of the Closing and the date this Agreement is terminated in accordance with its terms, Seller shall use commercially reasonable efforts to conduct the Business in substantially the same manner as conducted by Seller on the date of this Agreement, taking into account business exigencies arising as a result of Seller's financial condition and issues arising from or relating to Seller's Chapter 11 bankruptcy case.

6.2. Obligations of Seller after Entry of Sale Order. From and after the date that the Sale Order is entered, Seller shall use reasonable best efforts to cause the Closing to occur as promptly as practicable, and Seller shall not, intentionally take or cause to occur any action that is reasonably likely to prevent or delay the consummation of the transactions contemplated hereby unless otherwise required by the Bankruptcy Court or Law. The "reasonable best efforts" of Seller shall not require Seller or any of its Related Persons to expend any money to remedy any breach of any representation or warranty hereunder, to commence any litigation or arbitration proceeding, to offer or grant any accommodation (financial or otherwise) to any third party, to obtain any Consent required for the consummation of the transactions contemplated hereby or to provide financing to Buyer for the consummation of the transactions contemplated hereby; provided that, if Seller elects to remedy such breach, Seller shall not be deemed to be in breach of such representation or warranty, or in violation of any covenant, for purposes of determining Buyer's obligations to consummate the transactions contemplated by this Agreement.

6.3. Access to Properties and Records; Confidentiality. Prior to the earlier to occur of the Closing Date or the date on which this Agreement is terminated in accordance with its terms, Seller shall afford to Buyer and to the accountants, counsel and representatives of Buyer, reasonable access during normal business hours and upon reasonable notice to all Books and Records of Seller relating to the Business for purposes of assisting in the transition of the Acquired Assets and any Assumed Liabilities to Buyer at the Closing if (a) permitted under Law, (b) such Books and Records are not subject to confidentiality agreements, and (c) disclosing such Books and Records would not adversely affect any attorney client privilege, work product or similar privilege. Upon reasonable prior notice, Seller shall also afford Buyer reasonable access, during normal business hours, to the Business, to all operations of the Business and to all Acquired Assets throughout the period prior to the Closing Date for purposes of assisting in the transition of the Acquired Assets and the Assumed Liabilities to Buyer at the Closing. The rights of access contained in this Section 6.3 are granted subject to, and on, the following terms and conditions: (i) nothing herein shall require Seller to provide access to or disclose any information if such access or disclosure would be in violation of applicable Laws or regulations of any Government or the provisions of any agreement to which such Party is a party; (ii) all requests for access shall be directed to Michel F. Mills, Esq. General Counsel for Seller (the "*Seller Designated Contact*"); and (iii) any such investigation

13

50

shall not include physical testing or samplings and such access shall be exercised in such a manner as not to interfere unreasonably with the operation of the Business, and such access shall occur in such a manner as Seller reasonably determines to be appropriate to protect the confidentiality of such information sought; (iv) such rights of access shall not affect or modify the conditions set forth in Article 11 in any way; (v) all such rights of access are at Buyer's sole cost, expense and risk; and Buyer shall indemnify Seller for any damages, suits, claims, proceedings, fines, judgments, costs or expenses (including attorneys' fees and incidental, consequential or punitive damages) that Seller and its Related Persons or any third party may suffer as a result of Buyer's exercise of its rights under this Section 6.3; and (vi) Seller shall not provide access or disclose any information if such access or disclosure would cause significant competitive harm to Seller or Affiliates if the transactions contemplated by this Agreement are not consummated.

      6.4.     Further Assurances.  Upon the request and at the sole expense of Buyer at any time after the Closing Date (but without additional consideration), Seller shall execute and deliver such documents as Buyer or its counsel may reasonably request to effectuate the transactions contemplated by this Agreement.

## ARTICLE 7
## COVENANTS OF BUYER

Buyer hereby covenants to Seller as follows:

      7.1.     Actions Before Closing Date.  Buyer shall use reasonable best efforts (a) to perform and satisfy all conditions to each of Buyer's obligations to consummate the transactions contemplated by this Agreement that are to be performed or satisfied by Buyer under this Agreement and (b) to cause the Closing to occur as promptly as practicable and Buyer shall not, and shall not permit any of its Affiliates to, intentionally take any action that is reasonably likely to prevent or delay the consummation of the transactions contemplated hereby. At all times after the date of this Agreement, Buyer shall maintain, solely for use for its obligations under this Agreement and the Ancillary Agreements, financial capability in an amount not less than that needed to fulfill its obligations under this Agreement and the Ancillary Agreements at the Closing and thereafter.

      7.2.     Adequate Assurances.  To the extent requested by the Bankruptcy Court, Seller or the counterparty to any Assigned Contract, Buyer shall provide (a) the Bankruptcy Court, Seller or such counterparty, as the case may be, adequate assurance of the future performance of such Assigned Contract by Buyer and (b) Seller such letters of credit, insurance, bonding and other security as reasonably requested by Seller to ensure Seller of Buyer's payment and performance of the Assigned Contracts and the Assumed Liabilities.

      7.3.     Cure of Defaults.  Buyer shall, on or prior to the Closing, cure any and all defaults under any Assigned Contracts that are required to be cured under the Bankruptcy Code, so that such Contracts may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

14

7.4.      Availability of Business Records.  After the Closing Date, Buyer shall provide to Seller, its Affiliates and its and their Related Persons (after reasonable notice and during normal business hours and without charge to Seller, its Affiliates and its and their Related Persons) access to all Business Records of the Business or the Acquired Assets and Assumed Liabilities for periods prior to the Closing and shall preserve such Business Records until the later of (a) three (3) years after the Closing Date and (b) the required retention period for all Government contact information, records or documents.  Such access includes access to any information in electronic or digital form to the extent reasonably available.  Buyer acknowledges that Seller has the right to retain copies of Business Records for periods prior to the Closing.  If, after the Closing, Buyer (or any Affiliate or creditor of Buyer) receives any payment or revenue that belongs to Seller pursuant to this Agreement or any Ancillary Agreement, Buyer shall promptly remit or cause to be remitted the same to Seller without set-off or deduction of any kind or nature.

7.5.      Buyer   Obligation   to   Perform;   Cooperation   with   Seller Enforcement of Rights.

(a)      Buyer shall pay, perform and discharge all Assumed Liabilities (if any) when due or obligated and will indemnify and hold Seller, each of its Affiliates and each of their Related Persons harmless for any and all Losses suffered by any of them form any breach of the covenants and agreements of Buyer in this Section 7.5.

(b)      Buyer acknowledges and agrees that the Retained Litigation is being retained by Seller.  Buyer shall, at the written request of Seller and, at Seller's cost and expense, cooperate with Seller in its pursuit, prosecution, and defense of any Claim related to the Retained Litigation or other litigation that may be instituted by or against Seller or its Related Persons related to the Acquired Assets, the operation of the Business or the transactions contemplated hereby, including by making individuals available to provide testimony or information in connection therewith and to make Books and Records available for review, inspection and, as necessary, production.

7.6.      Further Assurances.  Upon the request and at the sole expense of Seller at any time after the Closing Date (but without additional consideration), Buyer shall execute and deliver such documents as Seller or its counsel may reasonably request to effectuate the transactions contemplated by this Agreement.

## ARTICLE 8
## BANKRUPTCY PROCEDURES

8.1.      Bankruptcy Actions.  Seller shall use reasonable best efforts to obtain entry by the Bankruptcy Court of an Order, in form acceptable to and approved by Buyer, to approve the sale of the Acquired Assets pursuant to this Agreement free and clear of all liens, claims and interests in accordance with 11 U.S.C. § 363, and authorizing the assumption and assignment of executory Contracts in accordance with 11 U.S.C. § 365 (the "*Sale Order*").  Seller shall file with the Bankruptcy Court a motion seeking entry of the Sale Order.  Seller shall serve all parties known to Seller to be entitled to notice of the Sale Motion under applicable

15

provisions of the Bankruptcy Code and Rules, including all parties to the Assigned Contracts and all Governments having or asserting jurisdiction over Seller or the Acquired Assets, and shall also mail notice of the sale to all persons and entities on Seller's customer list, and shall diligently pursue the obtaining of the Sale Order. Buyer shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order or any other Order reasonably necessary in connection with the transactions contemplated by this Agreement and the Ancillary Agreements, including furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court. Furthermore, Buyer covenants and agrees that it shall cooperate with Seller in connection with furnishing information or documents to Seller to satisfy the requirements of adequate assurance of future performance under Section 365(f)(2)(B) of the Bankruptcy Code.

8.2.    Bidding Procedures.  In the event that a competing bid to acquire all or a substantial part of the Assets is approved by the Court (an "Alternative Transaction") and the Lead Bidder is not the purchaser of the Acquired Assets as a result, the Lead Bidder shall be entitled to be paid an amount equal to the reasonable expenses incurred by Buyer's representatives, agents, employees and attorneys and professionals in connection with its investigation, negotiation, structuring and financing of the Sale (including, but not limited to, legal, accounting, consulting, auditing, and financial advisory fees) in an amount up to and including $300,000 (the "Break-Up Fee"),  provided that, the Break-Up fee shall only be payable if (a) the Lead Bidder agrees in writing at the Auction to be the backup bidder, and (b) the Alternative Transaction closes.   The Break-Up Fee shall be paid from the sale proceeds at the Closing of the Alternative Transaction, or as soon thereafter as any dispute regarding the amount of the Breakup Fee is fully resolved, with such payment to be free and clear of all claims, liens and interests in or on the property of the Debtor or the Bankruptcy Estate. An amount equal to the maximum Breakup Fee of $300,000 shall be set aside from the sale proceeds of the Alternative Transaction until the amount of the Breakup Fee is determined.

Seller shall seek approval of the provisions for the Break-Up Fee in a motion for approval of procedures for bidding on the sale of Acquired Assets (the "*Bidding Procedures*").

8.3.    Approval.  Notwithstanding anything in this Agreement to the contrary, Buyer acknowledges and agrees that Seller's obligations under this Agreement and under the Ancillary Agreements are subject to the orders of the Bankruptcy Court in the Chapter 11 Case and no breach of this Agreement shall be deemed to have occurred to the extent that Seller does not perform any of its obligations or agreements or Seller does not take or omits to take any action necessary to prevent a breach of any representation, warranty, covenant or agreement, under this Agreement, in each case to the extent that such performance, action or omission would cause it to violate an order of the Bankruptcy Court or requirement applicable to Seller in its Bankruptcy Case.

## ARTICLE 9
## EMPLOYEE AND BENEFITS MATTERS

16

This Article 9 sets forth Buyer's and Seller's acknowledgements, covenants and undertakings with respect to certain matters related to employees of the Business.

9.1.    Offers of Employment.

Buyer shall make offers of employment to substantially all of the employees of Seller employed as of the Closing Date, on substantially the same terms as of the Closing Date, including but not limited to base salary or hourly wage rate, as applicable, and other compensation. Seller shall (i) cooperate with and use its reasonable commercial efforts to make reasonably accessible to the Buyer those employees of Seller to whom the Buyer anticipates making offers of employment and (ii) assist the Buyer in its efforts to secure satisfactory employment arrangements with those employees of Seller.

9.2.    Severance. Effectively immediately prior to the Closing, Seller shall terminate the employment of all employees of Seller and pay said employees all accrued salaries, vacation pay, accrued sick pay as required by law, accrued holiday pay and any other accrued benefits and Buyer shall have no obligations with respect thereto.

9.3.    Employment at Will. Except as provided in any Contract assumed by Buyer, any employment opportunity offered by the Buyer may be "at will" and may be terminated by the Buyer or any of its affiliates at any time for any reason. Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Buyer to terminate, reassign, promote or demote any of the Transferred Employees after the Closing or to change the title, powers, duties, responsibilities, functions, locations, salaries, other compensation or terms or conditions of employment of such Transferred Employees.

9.4    Employee Benefit Plans. Seller is solely responsible for complying with all obligations related to operating or terminating any of its Employee Benefit Plans. However, as to periods following the Closing Date, Buyer assumes pursuant to Schedule 1.3 or accepts assignment of pursuant to Schedule 15.2, any and all of Seller's Employee Benefit Plans and all rights or obligations under or related to any such plans effective on or before the *Closing Date*.

9.5    COBRA Obligations. Seller shall be responsible for satisfying all COBRA obligations that Seller may have to offer continuation coverage at the employees' expense with respect to any of the qualified beneficiaries and their covered dependents in accordance with law and with respect to any "qualifying event" which occurs prior to or in connection with the sale. However, as to periods following the Closing Date, Buyer assumes pursuant to Schedule 1.3 or accepts assignment of pursuant to Schedule 15.2, any and all COBRA obligations and all rights or obligations under or related to any such plans effective on or before the *Closing Date*.

### ARTICLE 10
### TAXES AND FEES

10.1    Taxes Related to Purchase of Assets. All state and local sales, use, gross-receipts, transfer, gains, excise, value-added or other similar Taxes incurred in connection with the transfer of the Acquired Assets and the assumption of the Assumed Liabilities, and all

17

recording and filing fees that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets and the assumption of the Assumed Liabilities (collectively, "*Transaction Taxes*"), shall be paid by Buyer on or prior to their due date and Buyer shall indemnify, defend and hold harmless Seller and its Affiliates (and its and their Related Persons) from and against any and all liability for the payment of such Transaction Taxes and the filing of any Tax Returns related thereto.

10.2    Cooperation on Tax Matters.  Seller and Buyer shall (and shall cause their respective Affiliates to) cooperate fully with each other and make available or cause to be made available to each other for consultation, inspection and copying (at such other Party's expense), in a timely fashion, such personnel, Tax data, relevant Tax Returns or portions thereof and filings, files, books, records, documents, financial, technical and operating data, computer records and other information as may be reasonably required (a) for the preparation by such other Party or its Affiliates of any Tax Returns or (b) in connection with any Tax audit or proceeding including one Party (or an Affiliate thereof) to the extent such Tax audit or proceeding relates to or arises from the transactions contemplated by this Agreement.

10.3    Allocation of Purchase Price and Purchase Price Allocation Forms. The Purchase Price, the Assumed Liabilities and other relevant items shall be allocated among the Acquired Assets in accordance with Section 1060 of the Tax Code.  Buyer shall prepare and deliver to Seller an allocation schedule setting forth Buyer's determination of the allocation (the "*Allocation Schedule*") within ten (10) days after the date hereof, which Allocation Schedule shall be subject to the reasonable approval of Seller.  The Allocation Schedule shall identify the transferor and transferee thereof and shall be prepared in accordance with Treas. Reg. Section 1.1060-1 (or any comparable provision of state or local Tax Law) or any successor provision.  The Parties on behalf of themselves and their respective Affiliates agree that they will report the federal, state, local and other Tax consequences of the purchase and sale hereunder (including in filings on IRS Form 8594) in a manner consistent with such allocation and that they will not take any position inconsistent therewith in connection with any Tax Return, refund claim, litigation or otherwise, unless and to the extent required to do so pursuant to applicable Law.  Seller and Buyer shall, and shall cause their Affiliates to, cooperate in the filing of any forms (including IRS Form 8594) with respect to such allocation.  Notwithstanding any other provision of this Agreement, this Section 10.3 survives any termination or expiration of this Agreement.

10.4    Unbilled Transactional Taxes.  If a Tax assessment is levied upon Seller or its Affiliates (or its or their Related Persons) by an authorized Tax jurisdiction for unbilled Transaction Taxes then Buyer shall promptly pay to Seller the amount of such Taxes including any interest and penalty upon receipt of notification of the same from Seller.

## ARTICLE 11
## CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

11.1    Conditions Precedent to Performance by Seller and Buyer.  The respective obligations of Seller and Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver by Buyer and Seller (other than the condition

18

contained in Section 12.2(d), the satisfaction of which cannot be waived), on or prior to the Closing Date, of the following conditions:

   (a) Sale Order.  The Bankruptcy Court shall have entered the Sale Order, in form acceptable to and approved by Buyer, no appeal from the Sale Order shall be pending, and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

   (b) No Violation of Orders.  No preliminary or permanent injunction or other Order that declares this Agreement invalid or unenforceable in any material respect or that prevents the consummation of the transactions contemplated hereby or thereby shall be in effect on the Closing Date.

   (c) Comerica Bank Release.  The liens held by secured creditor Comerica Bank shall be released or be subject to a provision of the Sale Order allowing the sale of the Acquired Assets free and clear of such liens, with all such valid liens to attach to the proceeds, allowing the sale of the Acquired Assets free and clear of any and all liens, claims and interests held by Comerica Bank against Seller and the Acquired Assets.

   (d) Buyer and Grech shall have entered into a contribution agreement pursuant to which Grech will transfer all of his right title and interest in Krystal Enterprises, LLC, a Nevada limited liability company, and Imperial Highway, LLC, a California limited liability to Buyer, in consideration for conveyance to Grech of fifty percent (50%) ownership interest in Buyer.

   (e) No Termination of Agreement.  This Agreement shall not have been terminated in accordance with Article 12.

   (f) Any condition specified in this Section 11.1 may be waived only by a written instrument executed by Buyer and Seller.

   11.2 Conditions Precedent to Performance by Seller.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Seller in its sole discretion in a written instrument executed and delivered by Seller:

   (a) Representations and Warranties of Buyer.  Each of the representations and warranties made by Buyer in this Agreement shall be true and correct as of the Closing Date as if made anew as of such date (except to the extent any such representation and warranty expressly relates to an earlier date (in which case as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or the Ancillary Agreements or caused by the transactions contemplated hereby or thereby and except for any failure of any such representation and warranty to be true and correct as does not have a Material Adverse Effect, and Seller shall have received on the Closing Date a certificate (in a commercially reasonable form acceptable to Seller) dated as of the Closing Date and signed by a duly authorized signatory of Buyer to that effect.

19

(b)    <u>Performance of the Obligations of Buyer</u>.  Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Purchase Price in accordance with the terms of this Agreement, which obligation shall be performed in all respects as required under this Agreement), and Seller shall have received on the Closing Date a certificate (in a commercially reasonable form acceptable to Seller) dated the Closing Date and signed by a duly authorized signatory of Buyer to that effect.

(c)    <u>Cure of Defaults</u>.  Buyer shall have obtained the Sale Order authorizing the assumption by Seller and assignment to Buyer of the Assigned Contracts in accordance with the provisions of Section 365 of the Bankruptcy Code.

(d)    <u>Buyer's Deliveries</u>.  Buyer shall have delivered to Seller all of the items set forth in <u>Section 3.3</u> of this Agreement.

(e)    <u>Mutual Conditions</u>.  All of the conditions set forth in <u>Section 11.1</u> shall have been satisfied.

11.3    <u>Conditions Precedent to the Performance by Buyer</u>.    The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Buyer in its sole discretion in a written instrument executed and delivered by Buyer:

(a)    <u>Representations and Warranties of Seller</u>.  Each of the representations and warranties contained in <u>Article 4</u> of this Agreement shall be true and correct as of the Closing Date as if made anew as of such date (except to the extent any such representation and warranty expressly relates to an earlier date (in which case as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or the Ancillary Agreements or caused by the transactions contemplated hereby or thereby and except for failure of any such representation and warranty to be true and correct as does not have a Material Adverse Effect, and Buyer shall have received on the Closing Date a certificate (in a commercially reasonable form acceptable to Buyer) dated as of the Closing Date and signed by a duly authorized signatory of Seller to that effect.

(b)    <u>Performance of the Obligations of Seller</u>.  Seller shall have materially performed all obligations required under this Agreement to be performed by it on or before the Closing Date, and Buyer shall have received on the Closing Date a certificate (in a commercially reasonable form acceptable to Buyer) dated as of the Closing Date and signed by a duly authorized signatory of Seller to that effect.

(c)    <u>Material Adverse Effect</u>.  Since the date of this Agreement, no Material Adverse Effect shall have occurred and be continuing.

20

(d)      Seller's Deliveries.  Seller shall have delivered to Buyer all of the items set forth in Section 3.2 of this Agreement.

(e)      Mutual Conditions.   All of the conditions set forth in Section 11.1 shall have been satisfied.

11.4      Waiver of Condition; Frustration of Conditions.  All conditions to the Closing shall be deemed to have been satisfied or waived from and after the Closing.  Neither Buyer nor Seller may rely on the failure of any condition set forth in this Article 11, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the transactions contemplated hereby.

### ARTICLE 12
### TERMINATION AND EFFECT OF TERMINATION

12.1      Right of Termination.  Notwithstanding anything to the contrary contained herein, this Agreement may be terminated only as provided in this Article 12.  In the case of any such termination, the terminating Party shall give notice to the other Party specifying the provision pursuant to which the Agreement is being terminated.

12.2      Termination Without Default.  This Agreement may be terminated at any time before Closing:

(a)  by mutual written consent of Seller and Buyer;

(b)  by Buyer, if (i) the Sale Motion is not filed within 20 days of the Petition Date; (ii) the Sale Order is not entered by January 12, 2011, or (iii) Closing does not occur by January 26, 2011 (the "*Termination Date*"), or if any condition contained in Section 11.1 has not been satisfied or waived as of the Termination Date; provided, however, that Buyer shall have no right to terminate this Agreement under this Section12.2.(b) if Buyer's failure to fulfill any of its obligations under this Agreement is the reason that the Closing has not occurred on or before said date;

(c)  by Seller, on or after the Termination Date, if any condition contained in Section 11.1 has not been satisfied or waived as of such time; provided, however, that Seller shall have no right to terminate this Agreement under this Section 12.2(c) if Seller's failure to fulfill any of its obligations under this Agreement is the reason that the Closing has not occurred on or before said date; or

(d)  by either Buyer or Seller, immediately upon an Order becoming final and non-appealable that declares this Agreement invalid or unenforceable in any material respect or that prevents the consummation of the transactions contemplated hereby or thereby (a "*Termination Order*"); provided, however, that neither Seller nor Buyer shall have the right to terminate this Agreement pursuant to this Section 12.2 (d) if such Party or any of its Affiliates has sought entry of, or has failed to use its reasonable best efforts to oppose entry of, such Termination Order.

21

(e) by Buyer if the Bankruptcy Court shall enter an Order (the "**Overbid Order**") approving a bid from a third-party (the "**Overbid Sale**"); provided, however, if such Overbid Order provides that Buyer is deemed to be the back-up bidder (which shall be subject to Buyer's consent, in its discretion), the effectiveness of this Agreement shall be extended until the earlier of: (A) the consummation of the Overbid Sale, in which case this Agreement shall be automatically terminated or (B) the expiration of the period for consummating the Overbid Sale set forth in the Overbid Order (the "**Overbid Period**") plus five Business Days. In the event that the Overbid Sale is not consummated by the expiration of the Overbid Period, assuming the satisfaction of all conditions set forth in Article 12, Seller and Buyer shall consummate the transactions contemplated by this Agreement within five Business Days from the expiration of the Overbid Period.

(f) If this Agreement is terminated pursuant to Article 12, (i) this Agreement shall be null and void and have no further legal effect (other than this Article 12, Article 14 and Article 15, each of which shall survive termination), (ii) each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same, and (iii) none of Seller, Buyer or any of their respective Affiliates or any of their Related Persons or their Affiliates' Related Persons shall have any liability or obligation arising under or in connection with this Agreement.

12.3    Effect of Failure of Seller's Conditions to Closing. Seller may terminate this Agreement if there has been a material violation or breach by Buyer of any covenant, representation or warranty contained in this Agreement which has prevented the satisfaction of any condition to the obligations of Seller at the Closing and such violation or breach has not been waived by Seller and such violation or breach is not capable of being cured or, if capable of being cured, has not been cured prior to the earlier of (i) ten (10) days after written notice thereof from Seller, or (ii) the Termination Date; provided that the right of termination pursuant to this Section 12.3 shall not be available to Seller at any time that Seller has violated or is in breach of any covenant, representation or warranty hereunder if such breach has prevented satisfaction of Buyer's conditions to Closing hereunder and has not been waived by Buyer or, if capable of cure, has not been cured by Seller; provided, further, that the failure to deliver the Purchase Price as required hereunder shall not be subject to cure hereunder unless otherwise agreed to in writing by Seller.

12.4    Effect of Failure of Buyer's Conditions to Closing. Buyer may terminate this Agreement if there has been a material violation or breach by Seller of any covenant, representation or warranty contained in this Agreement which has prevented the satisfaction of any condition to the obligation of Buyer at the Closing and such violation or breach has not been waived by Buyer and such violation or breach is not capable of being cured or, if capable of being cured, shall not have been cured prior to the earlier of (i) ten (10) days after written notice thereof from Buyer, or (ii) the Termination Date; provided that the right of termination pursuant to this Section 12.4 shall not be available to Buyer at any time that Buyer has violated or is in breach of any covenant, representation or warranty hereunder if such breach has prevented satisfaction of Seller's conditions to Closing hereunder and has not been waived by Seller or, if capable of cure, has not been cured by Buyer. If this Agreement is terminated

22

pursuant to this <u>Section 12.4</u>: (a) , (a) this Agreement shall be null and void and have no further legal effect (other than this Section <u>12</u>, <u>Article 14,</u> and <u>Article 15</u> 0, each of which shall survive termination), and (b) except as provided in this <u>Section 12.4</u>, none of Seller, Buyer or any of their respective Affiliates or any of their Related Persons or their Affiliates' Related Persons shall have any liability or obligation arising under or in connection with this Agreement.

## SECTION 13
## ADDITIONAL AGREEMENTS

13.1 <u>Litigation Support</u>. In the event and for so long as any Party or any of its Affiliates or any of its or their Related Persons actively is contesting or defending against any action, suit, audit, proceeding, hearing, investigation, charge, complaint, claim, or demand in connection with (a) any transaction contemplated by this Agreement or the Ancillary Agreements or (b) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving Seller or the Business, the other Party will cooperate with the contesting or defending Person and its counsel in the contest or defense, make available its personnel, and provide such testimony and access to its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Person (unless the contesting or defending Person is entitled to indemnification therefore pursuant to this Agreement).

13.2 <u>Waiver of Distribution by Acquired Entities from Seller's Estate.</u> Buyer agrees that, following its acquisition of control of Edson Financial, Inc., Krystal Enterprises, LLC, and Krystal International, Buyer shall cause such entities to waive their right to distribution on any claims in Seller's bankruptcy estate.

## ARTICLE 14
## MISCELLANEOUS

14.1 <u>Successors and Assigns</u>. Except as otherwise provided in this Agreement, no Party may assign this Agreement or any rights or obligations hereunder without the prior written consent of the other Party and any such attempted assignment without such prior written consent shall be void and of no legal force or effect. This Agreement inures to the benefit of and is binding upon the successors and permitted assigns of the Parties. For all purposes hereof, a transfer, sale or disposition of a majority of the voting capital stock or other voting interests of Buyer (whether by contract or otherwise) shall be deemed an assignment hereunder. Notwithstanding anything herein to the contrary, without amending, modifying or terminating any of Buyer's obligations under this Agreement, Buyer may, not less than five (5) Business Days prior to Closing, designate one or more of its Subsidiaries to purchase all or any portion of the Acquired Assets and execution and delivery by such Person(s) of any agreement or document contemplated by <u>Section 3.3</u> of this Agreement shall be in full satisfaction of Buyer's obligations under <u>Section 3.3</u> to deliver any such agreement or document.

23

14.2    GOVERNING LAW; JURISDICTION.   THIS AGREEMENT
SHALL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH,
AND GOVERNED BY, THE LAWS OF THE STATE OF CALIFORNIA (WITHOUT
GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAWS OR CHOICE OF LAW
OF ANY JURISDICTION), EXCEPT TO THE EXTENT THAT THE LAWS OF SUCH
STATE ARE SUPERSEDED BY THE BANKRUPTCY CODE. FOR SO LONG AS SELLER
IS SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, THE PARTIES
HERETO IRREVOCABLY ELECT AS THE SOLE JUDICIAL FORUM FOR THE
ADJUDICATION OF ANY MATTERS ARISING UNDER OR IN CONNECTION WITH THE
AGREEMENT, AND CONSENT TO THE EXCLUSIVE JURISDICTION OF, THE
BANKRUPTCY COURT.    AFTER SELLER IS NO LONGER SUBJECT TO THE
JURISDICTION OF THE BANKRUPTCY COURT, ANY LEGAL ACTION OR
PROCEEDING WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS
CONTEMPLATED HEREBY MAY BE BROUGHT IN THE COURTS OF THE STATE OF
CALIFORNIA SITTING ORANGE COUNTY, CALIFORNIA OR OF THE UNITED STATES
FOR THE CENTRAL DISTRICT OF CALIFORNIA, AND BY EXECUTION AND
DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES CONSENTS TO THE NON-
EXCLUSIVE JURISDICTION OF THOSE COURTS.    EACH OF THE PARTIES
IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE
LAYING OF VENUE OR BASED ON THE GROUNDS OF *FORUM NON CONVENIENS*,
WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION
OR PROCEEDING IN ANY SUCH JURISDICTION IN RESPECT OF THIS AGREEMENT,
THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED
HEREBY OR THEREBY.

14.3    Mutual Disclosures. Prior to the Closing, each of Buyer and Seller
shall promptly notify the other Party hereto if such Party obtains knowledge that any of the
representations and warranties in this Agreement is not true and correct in all material respects.

24

## 14.4      Warranties Exclusive.

(a)      The representations, warranties, covenants and agreements contained in this Agreement and the Ancillary Agreements are the only representations, warranties, covenants or agreements given by Seller and its Related Persons and all other express or implied warranties are disclaimed.      Buyer acknowledges that Seller is making no representations or warranties, in this Agreement or in any Ancillary Agreement, regarding or relating to any Affiliate and, neither Seller nor any of its Affiliates shall have any obligations or liabilities under this Agreement or any Ancillary Agreements with respect to any of Seller's Affiliates.      Furthermore, Buyer acknowledges and agrees that (i) the Acquired Assets are conveyed "AS IS," "WHERE IS" and "WITH ALL FAULTS" and that ALL WARRANTIES OF MERCHANTABILITY, USAGE OR SUITABILITY, FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS, SAMPLES OF MATERIALS OR MANUFACTURER DESIGN ARE DISCLAIMED, (ii) it has not relied on any representation, warranty, covenant or agreement of Seller or its Affiliates or its or their Related Persons, other than the express representations, warranties, covenants and agreements of Seller made in this Agreement, (iii) Buyer has made its own investigation of the Acquired Assets and Assumed Liabilities and, based on such investigation and its own conclusions derived from such investigation, has elected to proceed with the transactions contemplated hereby and (iv) no material or information provided by or communications made by (or on behalf of) Seller or its Affiliates or its or their Related Persons will create any representation or warranty of any kind, whether express or implied, with respect to the Acquired Assets and the title thereto, the operation of the Acquired Assets, the Assumed Liabilities, the Business, the prospects (financial and otherwise), risks and other incidents of the Business.

(b)      Without limiting the generality of the foregoing, Buyer acknowledges and agrees that none of Seller or its Affiliates or its or their Related Persons  has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Business, except as expressly set forth in this Agreement.  Buyer further agrees that none of Seller or its Affiliates or its or their Related Persons will have or be subject to any liability to Buyer or any other Person resulting from the distribution to Buyer, or Buyer's use of, any such information and any information, document or material made available to Buyer or its Related Persons, whether in certain "data rooms" and online "data sites," management, marketing or banking presentations or any other form, in expectation of the transactions contemplated by this Agreement. Notwithstanding anything else herein this Agreement shall not limit or render ineffective any representation or warranty made by Ed Grech for his own account in connection with the Contribution Agreement referenced in Section 11.1 (d) of this Agreement.

(c)      In connection with Buyer's investigation of the Business, Buyer may have reviewed certain projections, including projected statements of operating revenues and income from operations of the Business and certain business plan information regarding the Business.  Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to

25

it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that Buyer shall have no claim against Seller or its Affiliates or its or their Related Persons arising therefrom or related thereto. Accordingly, none of Seller or its Affiliates or their Related Persons makes any representations or warranties whatsoever with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts).

     14.5  Survival of Representations and Warranties. The representations and warranties, and covenants and agreements set forth in this Agreement or in any Ancillary Agreement shall not survive the Closing.

     14.6  Mutual Drafting. This Agreement is the result of the joint efforts of Buyer and Seller, and each of them and their respective counsel have reviewed this Agreement and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties, and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and therefore there shall be no construction against either Party based on any presumption of that Party's involvement in the drafting thereof.

     14.7  Waiver of Bulk Sales Laws. Each of the Parties acknowledges and agrees that Seller will not comply with, and hereby waives compliance by Seller with, any "bulk sales," "bulk transfer" or similar law relating to the transactions contemplated hereby.

     14.8  Expenses. Except as otherwise provided herein, including but not limited to Section 8.2, each of the Parties hereto shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal, accounting, banking, consulting and advisory fees, whether or not the transactions contemplated hereby are consummated. Buyer shall pay the cost of all Transaction Taxes payable upon or in connection with, and all surveys, title insurance policies, title and environmental consultant reports obtained in connection with this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby and all filing fees required to be paid in connection with any filings made or notices given pursuant to any Antitrust Law.

     14.9  Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement. In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision survives to the extent it is not so declared, and all of the other provisions of this Agreement remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended. Notwithstanding the foregoing, to the extent that a representation or warranty of any Party contained in this Agreement (each, a "***Representation***") addresses a particular issue with specificity (a "***Specific Representation***"), and no breach by such Party exists under such Specific

26

Representation, such Party shall not be deemed to be in breach of any other Representation (with respect to such issue) that addresses such issue with less specificity than the Specific Representation and if such Specific Representation is qualified or limited by such Party's knowledge, or in any other manner, no other Representation shall supersede or limit such qualification in any manner.

   14.10 <u>Notices</u>. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) if personally delivered, on the date of delivery, (b) if delivered by express courier service of national standing (with charges prepaid), on the Business Day following the date of delivery to such courier service, (c) if deposited in the United States mail, first-class postage prepaid, on the fifth Business Day following the date of such deposit, (d) if delivered by telecopy, upon confirmation of successful transmission, (i) on the date of such transmission, if such transmission is completed at or prior to 5:00 p.m., local time of the recipient Party on a Business Day, on the date of such transmission, and (ii) on the next day following the date of transmission, if such transmission is completed after 5:00 p.m., local time of the recipient Party, on the date of such transmission or is transmitted on a day that is not a Business Day, or (e) if delivered by Internet mail (with a delivery report); <u>provided</u> that the relevant computer record indicates a full and successful transmission or no failure message is generated (i) on the date of such transmission, if such transmission is completed at or prior to 5:00 p.m., local time of the recipient Party on a Business Day, on the date of such transmission, and (ii) on the next Business Day following the date of transmission, if such transmission is completed after 5:00 p.m., local time of the recipient Party or is transmitted on a day that is not a Business Day. All notices, demands and other communications hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

   Notices to Seller:

   Krystal Koach, Inc.
   2701 E. Imperial Highway
   Brea, CA 92821
   Attention: Mr. Ed Grech
   Facsimile: 714-986-1241

   with a copy to (which shall not constitute notice):

   ***Levene, Neale, Bender, Yoo & Brill, L.L.P.,***
   10250 Constellation Blvd., Suite 1700,
   Los Angeles, CA 90067
   Attention: Ron Bender, Esq.
   Telephone: 310.229.1234

   Facsimile: 310.229.1244

   E-mail: rb@lnbyb.com

27

Notices to Buyer: Dr. Winston Chung Hing Ha

with a copy to (which shall not constitute notice):

Robert J. Cousins, Esq.
Quintairos, Prieto, Wood & Boyer
One East Broward Blvd.
Suite 1400
Fort Lauderdale, Fl 33301
Telephone:       954-523-7008

14.11    Amendments; Waivers.   This Agreement may be amended or
modified, and any of the terms, covenants, representations, warranties or conditions hereof may
be waived, only by a written instrument executed by the Parties, or in the case of a waiver, by the
Party waiving compliance.  Any waiver by any Party of any condition, or of the breach of any
provision, term, covenant, representation or warranty contained in this Agreement, in any one or
more instances, is not deemed to be nor construed as a furthering or continuing waiver of any
such condition, or of the breach of any other provision, term, covenant, representation or
warranty of this Agreement.

14.12    Public Announcements.   No Party shall make any press release or
public announcement concerning the transactions contemplated by this Agreement without the
prior written approval of the other Party, unless a press release or public announcement is
required by Law or Order of the Bankruptcy Court.   If any such announcement or other
disclosure is required by Law or Order of the Bankruptcy Court, the disclosing Party shall give
the non-disclosing Party prior notice of, and an opportunity to comment on, the proposed
disclosure.  The Parties acknowledge that Seller will file this Agreement with the Bankruptcy
Court in connection with obtaining the Sale Order and Bidding Procedures Order.

14.13    Entire Agreement.  Except for the Confidentiality Agreement, this
Agreement and the Ancillary Agreements contain the entire understanding among the Parties
with respect to the transactions contemplated hereby and supersede and replace all prior and
contemporaneous agreements and understandings, oral or written, with regard to such
transactions.  All documents and instruments delivered pursuant to any provision hereof are
expressly made a part of this Agreement as fully as though completely set forth herein.

14.14    Parties in Interest.  Nothing in this Agreement is intended to confer
any rights or remedies under or by reason of this Agreement on any Persons other than Seller and
Buyer and their respective successors and permitted assigns.

14.15    DAMAGES.  FROM AND AFTER THE CLOSING, NO PARTY
SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, SPECIAL,
INDIRECT OR PUNITIVE DAMAGES (INCLUDING LOST PROFITS, LOSS OF

28

PRODUCTION OR OTHER DAMAGES ATTRIBUTABLE TO BUSINESS INTERRUPTION) ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT. THE EXCLUSION OF CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, SPECIAL, INDIRECT OR PUNITIVE DAMAGES AS SET FORTH IN THE PRECEDING SENTENCE SHALL NOT LIMIT THE RIGHTS OF ANY PERSON ENTITLED TO INDEMNIFICATION UNDER THIS AGREEMENT TO ANY SUCH DAMAGES PAYABLE TO THIRD PERSONS IN CONNECTION WITH A MATTER FOR WHICH A PERSON ENTITLED TO INDEMNIFICATION UNDER THIS AGREEMENT.

14.16   WAIVER OF JURY TRIAL.   THE PARTIES TO THIS AGREEMENT EACH HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. THE PARTIES TO THIS AGREEMENT EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

14.17   Headings.  The article and Section headings in this Agreement are for reference purposes only and do not affect the meaning or interpretation of this Agreement.

14.18   Construction.  Unless the context of this Agreement otherwise requires, (a) words of any gender include the other gender, (b) words using the singular or plural number also include the plural or singular number, respectively, (c) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement as a whole and not to any other particular article, Section or other subdivision, (d) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," (e) "shall," "will," or "agrees" are mandatory, and "may" is permissive, and (f) "or" is not exclusive.

14.19   Currency.   Except where otherwise expressly provided, all amounts in this Agreement are stated and shall be paid in United States currency, and without discount, rebate or reduction and subject to no counterclaim or offset (other than withholding Tax obligations required to be withheld by law), on the dates specified herein.

14.20   Time of Essence.  Time is of the essence of this Agreement.

14.21   Counterparts.  This Agreement may be executed in counterparts, each of which is deemed an original, but all of which constitute the same agreement.  This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by facsimile

29

(or other electronic transmission), shall be treated in all manner and respects as an original contract and is considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

### ARTICLE 15
### DEFINITIONS

15.1    Certain Terms Defined.  As used in this Agreement, the following terms have the following meanings:

"*Acquired Assets*" means all of the assets of Seller used or usable in connection with the Business, whether tangible or intangible, including without limitation the assets listed on Schedule 15.1 hereto, cash, cash equivalents, bank accounts, surety accounts, furniture, fixtures, equipment, vehicle, telephone systems, computers, printers, other peripherals, servers, software, raw goods, materials inventory, notes and accounts receivable, shipping supplies, customer lists, open purchase orders, rights under contracts listed on Schedule 15.2 hereto, books and records other than Retained Books and Records, trademarks, patents and any claims that Seller has or may have arising from any breach of a confidentiality agreement entered into between the Seller and prospective purchasers of Seller's business, and all common stock or other beneficial interests that Buyer owns in Edson Financial, Inc., a California corporation, and Imperial Highway, LLC; provided that, the Acquired Assets shall not include Contracts of Seller that are not listed on Schedule 15.2.

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such first Person where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through the ownership of voting securities, by contract, as trustee, executor or otherwise.

"*Ancillary Agreement*" means, collectively, any agreement to be executed by Seller and/or its Related Persons, on the one hand, and Buyer and/or its Related Persons on the other hand, in connection with the transactions contemplated by this Agreement.

"*Assigned Contracts*" means any Contract of Seller listed on Schedule 15.2 of this Agreement, and with respect to such Contracts as are subject to Section 365 of the Bankruptcy Code, assumption by the Debtor and assignment of such Contract to Buyer is approved by the Bankruptcy Court.

"*Auction*" means the auction conducted by Seller pursuant to Seller's proposed bidding procedures as set forth in the Seller's Sale Motion.

"*Bankruptcy Code*" means Title 11 of the United States Code.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Central District of California or such other court having jurisdiction over the Chapter 11 Case originally administered in the United States Bankruptcy Court of the Central District of California.

30

"*Business*" means Seller's business of manufacturing limousines, professional vehicles and luxury midsize buses and all business activities of Seller incidental to the foregoing.

"*Business Day*" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by Law or other Governmental action to close.

"*Business Records*" means all books, files and records related to the Acquired Assets or the Business, including reports, plans, data, test results, product specifications, designs, drawings, diagrams, training manuals, engineering data and other documents, safety reports, maintenance schedules, repair notes and archives, operating and production records, inventory records, business plans, and marketing and all other studies, documents and records but excluding any Retained Books and Records.

"*Chapter 11 Case*" means the case commenced or to be commenced by Seller under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"*Claims*" means all claims, defenses, cross claims, counter claims, debts, suits, remedies, liabilities, demands, rights, obligations, damages, expenses, rights to refunds, reimbursement, recovery, indemnification or contribution, attorneys' or other professionals' fees and causes of action whatsoever, whether based on or sounding in or alleging (in whole or in part) tort, contract, negligence, gross negligence, strict liability, bad faith, contribution, subrogation, respondeat superior, violations of federal or state securities laws, breach of fiduciary duty, any other legal theory or otherwise, whether individual, class, direct or derivative in nature, liquidated or unliquidated, fixed or contingent, whether at law or in equity, whether based on federal, state or foreign law or right of action, foreseen or unforeseen, mature or not mature, known or unknown, disputed or undisputed, accrued or not accrued, contingent or absolute (including all causes of action arising under Sections 510, 544 through 551 and 553 of the Bankruptcy Code or under similar state Laws including fraudulent conveyance claims, and all other causes of action of a trustee and debtor in possession under the Bankruptcy Code) or rights of set off.

"*Consent*" means any consent, approval, authorization, qualification, waiver or notification of a Government or any other Person.

"*Contract*" means any written or oral contract, agreement, license, sublicense, lease, sublease, easement, mortgage, instruments, guaranties, commitment, undertaking or other similar arrangement, whether express or implied, other than the Permits.

"*DIP Loan*" means any loan made to Seller after the Petition Date by Seven One Limited, A BVI Company, which is approved by an order of the United States Bankruptcy Court presiding over the Chapter 11 Case.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

31

"*ERISA Affiliate*" means any entity treated as a single employer with Seller pursuant to Section 414 of the Tax Code.

"*Excluded Assets*" means the following:

(a) marketable securities, insurance policies, rights to tax refunds, and all Claims that Seller has or may have against third parties, including, without limitation, avoidance actions that may exist pursuant to Chapter 5 of the Bankruptcy Code, except for any such avoidance actions which Seller may have against Edson Financial, Inc., Imperial Highway, LLC, Krystal Enterprises, LLC, and Krystal International, or any affiliate of Buyer, and claims that Seller has or may have for any breach of a confidentiality agreement entered into between the Seller and prospective purchasers of Seller's business, all of which claims shall be included in the Acquired Assets;

(b) any assets (including Contracts) which are not transferable or for which Consent to a transfer is required and not obtained;

(c) all Retained Books and Records;

(d) all rights of Seller arising under (i) this Agreement, (ii) any Ancillary Agreement, and (iii) any other agreement between Seller and Buyer entered into in connection with this Agreement;

(e) all rights (x) to recovery of Seller under any cash collateral agreement or order in the Chapter 11 Case, (i) cash collateral, (ii) any cash or other collateral given to obtain or maintain letters of credit or similar surety (including in respect of workers' compensation obligations), and (iii) amounts drawn or paid on letters of credit and (y) under Contracts pursuant to which any security deposit, cash collateral, or other collateral was established or maintained; and

(f) every asset of Seller that would constitute an Acquired Asset (if owned by Seller on the Closing Date) that is conveyed or otherwise disposed of during the period from the date hereof until the Closing Date either (i) in the Ordinary Course of Business of Seller, (ii) at the direction of the Bankruptcy Court or (iii) as otherwise permitted by the terms of this Agreement.

"*Government*" means any agency, division, subdivision, audit group, procuring office or governmental or regulatory authority in any event or any adjudicatory body thereof, of the United States, any state or county thereof or any foreign government.

"*Knowledge of Seller*," "*Seller's Knowledge*" or any other similar term or knowledge qualification means the present actual knowledge of Seller or any other executive officer of Seller holding office as of the date of this Agreement.

"*Law*" means any provision of law, regulation, rule or other legal requirement of any Government.

32

"*Losses*" means any damages, fines, judgments, costs or expenses (including reasonable attorneys' fees).

"*Material Adverse Effect*" means a change or effect that results in a material adverse effect on the operation of the Business; provided that none of the following changes or effects, either alone or taken together with other changes or effects or whether arising directly or indirectly, shall be taken into account in determining whether there has been a Material Adverse Effect: (i) changes, or effects arising from or relating to changes, of Laws; (ii) changes arising from or relating to, or effects of, strikes, work stoppages or other labor disturbances; (iii) changes arising from or relating to, or effects of, increases in costs of commodities or supplies; (iv) changes arising from or relating to, or effects of, weather or meteorological events; (v) changes arising from or relating to, or effects of, the transactions contemplated by this Agreement or the announcement thereof or the taking of any action in accordance with this Agreement; (vi) changes, or effects arising from or relating to changes, affecting the industries of which the Business is a part generally (including any change, or any effect arising from or relating to any change; (vii) changes, or effects arising from or relating to changes, in economic, regulatory or political conditions generally; (viii) changes arising from or relating to, or effects of, any motion, application, pleading or Order filed under or in connection with, the Chapter 11 Case or any motion, application, pleading or Order filed by any Government; (ix) changes, or effects arising from or relating to changes, in financial, banking, or securities markets (including (a) any disruption of any of the foregoing markets, (b) any change in currency exchange rates, (c) any decline in the price of any security or any market index and (d) any increased cost of capital or pricing related to any financing); (x) changes arising from or relating to, or effects of, any existing event, occurrence, or circumstance with respect to which Buyer has knowledge as of the date hereof, (xi) changes arising from or relating to, or effects of, any seasonal fluctuations in the business, (xii) any failure, in and of itself, to achieve any projections, forecasts, estimates, performance metrics or operating statistics (whether or not shared with Buyer or its Affiliates) or (xiii) changes arising from or relating to, or effects of, any act(s) of war or of terrorism.

"*Obligations*" means any duties, responsibilities, liabilities and obligations, costs and expenses of whatever kind and nature, whether vested, absolute or contingent, primary or secondary, direct or indirect, known or unknown, asserted or unasserted, accrued or unaccrued, pre-petition or post-petition, liquidated or unliquidated, due or to become due, and whether based in common law or statute or arising under Contract or otherwise.

"*Order*" means any order, judgment or decree of any court or Government.

"*Ordinary Course of Business*" means the operation of the Business by Seller consistent with prior practices with respect to the operation thereof, and taking into account the status and quality of the Business and requirements of any applicable regulations.

"*Permits*" means the permits, authorizations, approvals, registrations, and licenses relating exclusively to the operation of the Business issued by any Government (and pending applications for the foregoing).

33

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

"*Petition Date*" means the date the Chapter 11 Case was filed.

"*Related Person*" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, financial advisors, restructuring advisors, attorneys, accountants, investment bankers, Affiliates or representatives of (i) any such Person and (ii) of any Affiliate of such Person." *Retained Books and Records*" means (a) all corporate seals, minute books, charter documents, corporate stock record books, original Tax and financial records and such other files, books and records to the extent they relate to any of the Excluded Assets or Excluded Liabilities or the organization, existence, capitalization or debt financing of Seller or of any Affiliate of Seller, (b) all books, files and records that would otherwise constitute a Business Record but for the fact that disclosure of such books, files or records could (i) violate any legal constraints or obligations regarding the confidentiality thereof, (ii) waive any attorney client, work product or other legal privilege, or (iii) disclose information about Seller or any of its Affiliates that is unrelated to the Business, or (c) all books and records prepared in connection with or relating in any way to the transactions contemplated by this Agreement, including bids received from other parties and analyses relating in any way to the Acquired Assets and any Assumed Liabilities.

"*Retained Litigation*" means all claims, cross-claims and counterclaims (and each defense related thereto) made on or prior to the Closing Date and pending against or otherwise involving Seller.

"*Rule*" or "*Rules*" means the Federal Rules of Bankruptcy Procedure.

"*Sale Motion*" means the Seller's Motion for Order (1) Approving the Sale of Substantially all Assets of the Estate Free and Clear of Liens, Claims, and Interests Pursuant to 11 U.S.C. §363, and (2) Authorizing the Assumption and Assignment of Certain Unexpired Leases and Executory Contracts

"Sale Order" shall have the meaning as defined in Section 8.1.

"*Tax Code*" means the Internal Revenue Code of 1986, as amended.

"*Tax Return*" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"*Taxes*" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, which taxes include all income taxes, Transaction Taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross

34

receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Tax Code) and other obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**SELLER**

Krystal Koach, Inc., a California corporation

By: _____

Name:  Edward Grech

Title:    Chief Executive Officer


**BUYER**

Krystal Infinity, LLC, a Nevada limited liability company


By: _____

Name: _____

Title: _____

35

receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Tax Code) and other obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**SELLER**

Krystal Koach, Inc., a California corporation


By: _____

Name: Edward Grech

Title:   Chief Executive Officer


**BUYER**

Krystal Infinity, LLC, a Nevada limited liability company

By: _____ 18-11-2010

Name: _____

Title: _____

35

Schedule 1.3
Assumed Liabilities

| Creditor | Balance November 5, 2010 |
|---|---|
| Comerica Equipment (Term Loan) | 908,989 |
| Ford Motor Credit MSA | 1,390,832 |
| Comerica Revolving Note | Assumed in amount equal to then balance, less amount of sale proceeds paid to Comerica |

| | |
|---|---|
| Customer deposits | 51,910.56 |
| Other * | 66,412 |
| Employee obligations ** | |
| Warranty Obligations *** | |
| Sales, Use and Occupation taxes **** | |
| US Bancorp Equipment Finance (Edson Financial) | |
| Wells Fargo Equipment Finance (Edson Financial) | |
| Bank of America Leasing Capital(Edson Financial) | |
| CIT (Edson Financial) | |
| Ford Motor Credit-Part Truck (2008 Ford 550) | 37,794 |
| Ford Motor Credit-Part Truck (2008 Ford 550) | 37,799 |
| Ally Bank - 2009 Cadillac loan | 61,308 |
| Comerica - swap 1473 , $3,600 per month | |
| Ford Motor Credit - 2009 Lincoln Navigator | 34,694 |

*Other

| Payee | Purpose | Monthly pmt | Balance |
|---|---|---|---|
| AFCO | General Liability insurance financing | 10,809 | 21,618 |
| Marsh | Insurance consulting fee | 4,445 | 8,890 |
| Toshiba | Copiers | 1,056 | 35,904 |

**   All liabilities and obligations under Seller's employee benefit plans or relating to payroll, payroll taxes, vacation, sick leave, workers' compensation, unemployment benefits, pension benefits, employee stock option or profit-sharing plans, health care plans or benefits or any other employee plans or benefit of any kind for any employee or former employee of Seller, arising after the Closing Date.

74

\*\*\* All obligations under written warranties issued by Seller in the ordinary course of business, remaining to be performed after the Closing Date; provided that Buyer does not assume any obligations which are the subject of pending litigation, or which are based on violations of "Lemon Laws" or similar statutes.

1. \*\*\*\* All liabilities of Seller relating to sales, use, and occupation taxes which are unpaid on the Closing Date.

Schedule 4.6
List of pending litigation matters

## I.    Open/Active Litigation Case List

*Ace Tours & Transportation, Inc. v. Navistar, Inc., Krystal Enterprises, Inc., Gateway Coachworks, Inc., TCF Equipment Finance, Inc.*, Circuit Court of the 17th Judicial District, Broward County, Florida, Case No. 09012392
Allegations: Breach of Contract, Breach of warranty/ Lemon Law

*Benson et al. v. Krystal Koach, Inc., et al.*
USDC N.D.Georga, Case No. 1:08-CV-2841 MHS
Alleged Injuries: Personal injuries and wrongful death
Submitted for insurance coverage

*Sister Case with Benson: Murray et al. v. Krystal Koach, Inc., et al.*
USDC N.D.Georga, Case No. 1:08-CV-2840 MHS
Alleged Injuries: Personal injuries and wrongful death
Submitted for insurance coverage

*Budget Paint Body & Equipment v. Krystal Enterprises*
OCSC – Central Case No. 30-2010 00392593
Alleged Breach of Contract

*East End Limousine, LLC v Krystal Koach, Inc.*
Supreme Court of the State of New York, County of Suffolk, Case No. 09/41130
Allegations: Breach of Contract, Breach of warranty/ Lemon Law

*Edith Sherman and William Sherman as PR of the Estate of Charles Sherman (Dec.) v. Ford Motor Company, Krystal Enterprises, Inc. and Krystal Koach*
Alleged Date of Loss:  February 22, 2010
Alleged Injuries:  Personal injuries and wrongful death
Submitted for insurance coverage

75

*Excelsior Stage Coach, Inc. v. Ford Motor Co., Krystal Koach, Inc.*
District Court, Harris County, Texas, 281st Judicial District, Case No.
2009-45508. Allegations: Breach of Contract, Breach of Warranty/
Lemon Law

*Lancer Ins. Co. a/s/o A-1 Quality Limousine, LLC v. Truck King
International Sales & Service, Inc., Krystal Koach of New York, Krystal
Enterprises, Inc.*
Supreme Court of the State of New York, County of Nassau, Case No. 21959/06
Allegations: Breach of Contract, Breach of Warranty/ Lemon Law

*Lancer Ins. Co. a/s/o Dynasty Limousines v. Krystal Enterprises, Inc.*
Supreme Court of the State of New York, County of Nassau, Case No. 014327/08
Allegations: Breach of Contract, Breach of Warranty/ Lemon Law

*MBZ Investments, Inc. v. Krystal Koach, Inc., Edson Financial, Inc.*
OCSC – Central, Case No. 30-2010 00397772
Alleged Breach of Contract

*Stilwell v. Krystal Koach, Inc.*
US District Court – Middle Dist of FL - No. 5:10-CV-00345–WTH-KRS
Alleged Injuries: Personal injuries, Submitted for insurance coverage

*Textron Financial, Corp. v. Krystal Koach, Inc.,*
USDC, Central District of CA – No. 8:10-CV-00982-JVS-RZ
Allegations: Breach of Contract

## II.    Notices of Potential Claims

*In the Matter of 24/7 Limousine* – Detroit, Michigan
Alleged Date of Loss: 9/12/10
Alleged Injuries: Two wrongful deaths

*In the Matter of: Amazing Limousines*
On 8/9/10 - Received notice of intent to file lawsuit for: Breach of
Contract/Lemon Law
Original lease allegedly entered into 7/24/09.

*California Air Resources Board v. Krystal Koach, Inc.*
Alleged violation of Health and Safety Code §§ 43150 et seq. (California's
vehicle emission control regulations) relating to two product lines Chrysler 300s
and Hummers. The Matter effectively closed in **July 2008** when CARB failed to
respond to Krystal's opposition to the alleged violations.

*Lancer Insurance Co. a/s/o AA Getaway Coaches v. Limousines and*

**Krystal Enterprises, LLC**
On September 27, 2010 Krystal received notice of alleged: Breach of
Warranty, Lemon Law.

**In the Matter of: Judith Nash and the Estate of Donald Nash, Sr.**
Alleged Date of Loss:  February 22, 2010
Alleged Injuries:  Personal injuries and wrongful death
Submitted for insurance coverage

**In the Matter of: The Estate of John Roy and Dolores Roy, Individually**
Alleged Date of Loss: February 22, 2010
Alleged Injuries: Personal injuries and wrongful death
Submitted for insurance coverage

**In the Matter of: The Mehrens Family**
Alleged Date of Loss: February 22, 2010
Alleged Injuries: Personal injuries and wrongful death
Submitted for insurance coverage

**In the Matter of: Jacklyn Plain**
On 9/21/10 Krystal received notice of alleged:  Breach of Warranty/Lemon Law
as      relates to 2008 F550 Gas Motor Home VIN 1FDAF56Y16EB27960

**In the Matter of:  Nelson Funeral Home, Inc. – State of Michigan**
On 10/19/10 Krystal received notice of alleged:  Breach of Warranty/Lemon Law,
as      relates to a 2010 Cadillac Funeral Hearse.

**In the Matter of:  Nor-Cal Beverage Limousine**
On 11/3/10 Krystal received notice of alleged:  Breach of Warranty/Lemon Law

**Union Bank-Notice of Intent to Sue Imperial Highway, LLC**
On June 28, 2010, the Bank served a notice of default and demand for payment
regarding the loan on the Lambert property.  The Bank bases its default on
Krystal's breach of the EBITDAR covenant; however, the Bank knew about this
condition for approximately 1 year, and it served notice of default only when
Krystal sought the Bank's approval of Thunder Sky.

**In the Matter of: Real World Forensic Engineering**
On 11/12/10 Krystal received notice of potential claim re: unpaid consulting and
litigation support fees.

**W.F. Schulties v. Krystal Enterprises, Inc.**
On March 10, 2010 – Krystal received a notice of claim for breach of contract by
an engineer/litigation consultant.

Schedule 15.1

**Acquired Assets**

2.  100% equity interest in Edson Financial, LLC, a California limited liability company.
3.  0.1% equity interest in Imperial Highway, LLC.
4.  All inventories consisting of vehicles in manufacturing process and parts inventory, including manufacture qualification and permit (value at the end of October 2010 of approximately $11,500,000).
5.  All furniture, fixtures, leasehold improvements, machinery and equipment (net book value at the end of October 2010 of approximately $1,500,000).
6.  All prepaid expenses, security deposits and utility deposits.
7.  All accounts receivable not collected as of the Closing.
8.  The following patents:

| Patent | Application No. Filing Date | Patent No. Reg. Date |
|---|---|---|
| Rear door structure for a vehicle | 08-941889 09/30/1997 | 6196617 03/06/2001 |
| Limousine side structure and window sealing method | 09-104020 06/24/1998 | 6116678 09/12/2000 |
| Bus coach body | 29-076318 09/08/1997 | D409951 05/18/1999 |
| Electric power generation system for limousine | 08/778080 01/02/1997 | 6044923 04/04/2000 |

9.  The following trademarks:

| Trademark | Serial No. Filing Date | Registration No. Reg. Date |
|---|---|---|
| Ring of Steel | 78-709398 09/08/2005 | n/a |
| Krystal Enterprises | 78-357816 01/26/2004 | 2925246 02/08/2005 |
| Krystal | 76-375902 02/27/2002 | 2892370 10/12/2004 |
| Preownedlimo | 76-130420 09/18/2000 | n/a |
| K and design | 75-353798 09/08/1997 | 2223871 02/16/1999 |
| Krystal Koach Inc. | 75-344401 08/21/1997 | 2248811 06/01/1999 |
| KKI and design | 75-180608 10/10/1996 | 2105354 10/14/1997 |
| Krystal | 75-165698 | 2358969 |

| | 09/12/1996 | 06/20/2000 | |
|---|---|---|---|

Schedule 15.2
Assigned Contracts

| Ford Authorized Converter Pool Agreement |
|---|
| KKI & Imperial Highway, LLC  - Real Estate Lease |
| Toshiba - Photocopiers Lease |
| Pitney Bowes - Postage machine |
| Sage Software - Accounting software (MAS90) |

Independent Contractors

| Anita Angeles Investment Co. (2 agreements) |
|---|
| Jim Kindleberger |
| Solomon, Winnett & Rosenfield |

Insurance Policies

| Safe Guard  - COBRA |
|---|

Exhibit A

Bill of Sale

## BILL OF SALE

This Bill of Sale (this "***Bill of Sale***") is made and entered into as of this _____ day of _____, 2010, by Krystal Koach, Inc., a California corporation ("***Seller***"), in favor of _____, a \_\_\_\_\_ corporation ("***Purchaser***").

Seller acknowledges that:

A.    Seller is a debtor and debtor in possession in chapter 11 proceedings before the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division.

B.    Seller and Purchaser have heretofore entered into that certain Asset Purchase Agreement dated November \_\_\_\_, 2010 (the "***Purchase Agreement***").    Except for terms specifically defined herein, the capitalized terms used in this Bill of Sale shall have the same meanings as capitalized terms used in the Purchase Agreement.

C.    Concurrently with the execution and delivery of this Bill of Sale, Seller and Purchaser are consummating the transactions contemplated by the Purchase Agreement.  Seller is executing and delivering this Bill of Sale in satisfaction of its obligations pursuant to Section 3.2 (a) of the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which Sellers hereby expressly acknowledge, Sellers agree that:

1.    Sellers hereby sell, transfer, assign and deliver to Purchaser, and Purchaser hereby purchases and acquires from Seller, all of Seller's right, title and interest in and to the Acquired Assets.

2.    The Acquired Assets are being delivered for good and valuable consideration, pursuant to the terms and conditions contained in the Purchase Agreement, and nothing contained herein shall in any way limit or expand or modify or otherwise affect the terms and conditions contained in the Purchase Agreement.

3.    This Bill of Sale shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

4.    This Bill of Sale shall be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and, where state law is implicated, the internal laws of the State of California, without giving effect to any principles of conflicts of law.

5.      This Bill of Sale may be executed in multiple counterparts, each of which shall be deemed an original hereof, and all of which shall constitute a single agreement effective as of the date hereof. Any delivery of an executed counterpart of this Bill of Sale by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of this Bill of Sale.

## *REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK.*

IN WITNESS WHEREOF, Sellers have caused this Bill of Sale to be executed as of the date first written above.

**SELLER:**

**KRYSTAL KOACH, INC.,**
a California corporation,
Debtor and Debtor in Possession

By: _____
Name: _____
Title: _____

**Agreed and Accepted as of**

**the date first above written.**

**PURCHASER:**

_____,
a Delaware corporation

By: _____
Name: _____
Title: _____

**SIGNATURE PAGE TO BILL OF SALE**

**EXHIBIT D**

Exhibit B

Assignment and Assumption Agreement

2

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Agreement") is made and entered into as of _____ __, 2010 by and between Krystal Koach, Inc. ("Assignee"), and _____, a _____ ("Assignor"), with reference to the following facts:

A.    Assignor and Assignee have entered into that certain Asset Purchase Agreement dated as of November __, 2010 ("Purchase Agreement") by and among Assignee and Assignor.

B.    Among other things, the Purchase Agreement provides for the sale by Assignor, and the purchase by Assignee, of substantially all assets of Assignor.

C.    Unless indicated otherwise by the context, the defined terms contained in the Purchase Agreement are incorporated herein by reference.

D.    Assignee and Assignor are entering into this Agreement to evidence the sale of Acquired Assets and assumption of Liabilities as provided in the Purchase Agreement ("Assumed Liabilities") on the terms set forth in the Purchase Agreement.

## ASSIGNMENT OF ASSETS

1.    In accordance with the Purchase Agreement, Assignor hereby assigns, transfers, conveys, and delivers to Assignee, and Assignee hereby accepts from Assignor, all of Assignor's right, title and interest in and to the Acquired Assets as defined in Section 15.1 of the Purchase Agreement, including but not limited to, the Contracts included in the Acquired Assets, free and clear of all claims, liens and encumbrances other than the Assumed Liabilities, to have and to hold such Acquired Assets hereby assigned, transferred and conveyed unto Assignee, its successors and assigns, to and for its own use and behalf forever.

2.    Expressly excluded from the interests and assets of Assignor assigned and transferred to Assignee hereunder are the Excluded Assets as defined in Section 15.1 of the Purchase Agreement.

## ASSUMPTION OF LIABILITIES

3.    In consideration of the assignment, transfer, conveyance, and delivery of the Acquired Assets to Assignee, Assignee hereby assumes and accepts those obligations and

3

85

liabilities of Assignor described in Section 1.3 of the Purchase Agreement as the Assumed Liabilities.

4.    Except for the Assumed Liabilities, and subject to the provisions of the Sale Order, the Assignee shall not assume or be responsible at any time for any liability, obligation, debt or commitment of Assignor, whether absolute or contingent, accrued or unaccrued, asserted or unasserted, or otherwise, including but not limited to any liabilities, obligations, debts or commitments of Assignor incident to, arising out of or incurred with respect to, this Agreement.

<u>INCORPORATION OF PROVISIONS OF PURCHASE AGREEMENT</u>

5.    The assignment of Acquired Assets and assumption of Assumed Liabilities pursuant to this Agreement are made on the terms set forth in the Purchase Agreement, the provisions of which are incorporated herein by reference.

<u>MISCELLANEOUS</u>

6.    This Agreement is to be governed by and construed in accordance with the laws of the State of California. In connection with any controversy arising out of or related to this Agreement, Assignee and Assignor hereby irrevocably to the exclusive jurisdiction to the Bankruptcy Court, or if, and only if, the Bankruptcy Case has been closed, the courts of the State of California (Los Angeles Division). Seller and Purchaser each irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts. The prevailing party in such action or proceeding shall be entitled to recover from the losing party all reasonable costs and expenses of such action, including, without limitation, attorneys' fees.

7.    This Agreement and the rights, covenants, conditions and obligations of the respective parties hereto and any instrument or agreement executed pursuant hereto shall be binding upon and inure to the benefit of the parties and their respective successors, assigns and legal representatives.

8.    This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  In making proof of this Agreement it should not be necessary to produce or account for more than one counterpart.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

4

86

ASSIGNOR:                                ASSIGNEE:


KRYSTAL KOACH, INC.,

A California Corporation


                                         By: _____

                                             Its: _____


By: _____

    Its: _____


5

Exhibit C

Patent Assignment

6

### ASSIGNMENT OF PATENTS

This Assignment of Patents (this "*Assignment*") is made and entered into as of this
_____ day of _____, 2010, by Krystal Koach, Inc., a California corporation ("*Assignor*"),
in favor of _____, a _____ corporation ("*Assignee*"). Assignor acknowledges that:

A.    Assignor is a debtor and debtor in possession in chapter 11 proceedings before the
United States Bankruptcy Court for the Central District of California, Santa Ana Division.

B.    Assignor and Assignee have heretofore entered into that certain Asset Purchase
Agreement dated October ____, 2010 (the "*Purchase Agreement*").  Unless otherwise defined
herein, capitalized terms used herein shall have the meaning given to such terms in the Purchase
Agreement.

C.    Concurrently with the execution and delivery of this Assignment, Assignor and
Assignee are consummating the transactions contemplated by the Purchase Agreement.
Assignors are executing and delivering this Assignment in satisfaction of their obligations
pursuant to the Purchase Agreement.

7

D.    Assignor is the owner of the Patents listed in Schedule 1 annexed hereto and made a part hereof.

E.    Assignee is desirous of acquiring the entire right, title, and interest in and to the Patents listed in Schedule 1 annexed hereto, in the United States of America, and in its colonies, territories and dependencies and also in all countries foreign to the United States of America.

For good and valuable consideration, the receipt of which is hereby acknowledged, Assignor agrees that:

1.    The Assignor has sold, assigned, and transferred, and by these presents do hereby sell, assign, and transfer unto said Assignee, free and clear of all Liens, the full and exclusive right, title, and interest in and to the aforesaid Patents listed in Schedule 1 hereto in the United States of America, and in its colonies, territories, and dependencies and also in all countries foreign to the United States of America, the same to be held and enjoyed by said Assignee for its own use, and for the use of its successors, assigns, or other legal representatives to the end of the term or terms for which said Patents may be granted as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made.

2.    Assignor hereby authorizes Assignee and its successors to apply for a patent or patents upon any of the inventions described in Schedule 1 hereto directly in its own name and hereby assign, sell, transfer and set over unto said Assignee and its successors all priority rights.

3.    Assignor shall, from time to time, upon presentation of and request by Assignee, execute and deliver to Assignee such additional instruments, documents, conveyances or assurances and take such other action as shall be necessary or otherwise reasonably requested by Assignee to confirm and assure the rights and obligations provided for in the Purchase Agreement, render effective the consummation of the transactions contemplated hereby and thereby, more effectively to vest in Assignee beneficial and record title to the interests hereby assigned, and to put Assignee in actual possession and operating control of such interests.

4.    The grant and assignment by Assignor to Assignee is irrevocable and without any right of Assignors to rescind, terminate or cancel this Assignment, or for any reason to enjoin or prevent or seek to enjoin or prevent the development, use or other exploitation of the Patents.

5.    Notwithstanding anything to the contrary herein, Assignor and Assignee are executing and delivering this Assignment in accordance with the Purchase Agreement. This Assignment is subject to all of the terms and conditions of the Purchase Agreement, and does not increase any liabilities or obligations nor decrease any rights or interests of either Assignor or Assignee thereunder.

6.    This Assignment may be executed in multiple counterparts, each of which shall be deemed an original hereof, and all of which shall constitute a single agreement effective as of the date hereof. Any delivery of an executed counterpart of this Assignment by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of this Assignment.

8

7.      This Assignment shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

8.      This Assignment shall be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and, where state law is implicated, the internal laws of the State of California, without giving effect to any principles of conflicts of law.

*REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK.*

9

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Assignment as of the date first written above.

**ASSIGNOR:**

**KRYSTAL KOACH, INC.,**
a California corporation,
Debtor and Debtor in Possession

By: _____
Name: _____
Title: _____

**Agreed and Accepted as of
the date first above written.**

**ASSIGNEE:**

_____,
a _____ corporation

By: _____
Name: _____
Title: _____

**SIGNATURE PAGE TO ASSIGNMENT OF PATENTS**

92

STATE OF CALIFORNIA                          )

                                             )   ss.

COUNTY OF _____                  )

     On _____, 2010 before me, _____, a
notary public for the state, personally appeared _____, who proved to me
on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s) acted, executed the instrument.

     I certify under PENALTY OF PERJURY under the laws of the State of California that
the foregoing is true and correct.

     WITNESS my hand and official seal.


_____
Notary Public

93

## Schedule 1

**Patents**

**EXHIBIT C**

Exhibit D

Marks Assignment

.

4

## ASSIGNMENT OF MARKS

This Assignment of Marks (the "*Assignment*") is made and entered into as of this _____ day of _____, 2010, by Krystal Koach, Inc., a California corporation ("*Assignor*"), in favor of _____, a _____ corporation ("*Assignee*"). Assignor acknowledges that:

F.      Assignor is a debtor and debtor-in-possession in chapter 11 proceedings before the United States Bankruptcy Court for the Central District of California, Santa Ana Division.

G.      Assignor and Assignee have heretofore entered into that certain Asset Purchase Agreement dated October ____, 2010 (the "*Purchase Agreement*").    Except for terms specifically defined in this Assignment, the capitalized terms used in this Assignment shall have the same meanings as such terms when used in the Purchase Agreement.

H.      Concurrently with the execution and delivery of this Assignment, Assignor and Assignee are consummating the transactions contemplated by the Purchase Agreement. Pursuant to the Purchase Agreement, Assignor is required to execute and deliver this Assignment at the Closing.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree that:

1.      Assignor does hereby sell, assign, transfer and convey to Assignee, and Assignee hereby accepts, all right, title and interest of Assignor in, to and under the trademarks described on Schedule 1 attached hereto (the "Marks") throughout the world, any registrations and applications for registration thereof, and the goodwill of the Business connected with the use thereof and symbolized thereby, free and clear of all Liens; all rights to apply for registrations for any thereof and any other rights corresponding thereto with full benefit of priority therein as may now or hereafter be granted to it by law, treaty or other international convention; and all rights, interests, claims and demands recoverable in law or equity, that Assignor has or may have in profits and damages for past, present and future infringements of the Marks, including, without limitation, the right to compromise, sue for and collect such profits and damages; the same to be held and enjoyed by Assignee, its successors and assigns or their legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignors if this Assignment had not been made.

2.      Assignor hereby agrees that it shall, upon presentation of and request by Assignee, from time to time, execute and deliver to Assignee such additional instruments, documents, conveyances or assurances and take such other action as shall be necessary or otherwise reasonably requested by Assignee to confirm and assure the rights and obligations provided for in the Purchase Agreement, render effective the consummation of the transactions contemplated hereby and thereby, more effectively to vest in Assignee beneficial and record title to the Marks, and to put Assignee in actual possession and operating control of such Marks.

5

**3.** Notwithstanding anything to the contrary herein, Assignor and Assignee are executing and delivering this Assignment in accordance with the Purchase Agreement. This Assignment is subject to all of the terms and conditions of the Purchase Agreement, and does not increase any liabilities or obligations nor decrease any rights or interests of either Assignor or Assignee thereunder.

4. This Assignment may be executed in multiple counterparts, each of which shall be deemed an original hereof, and all of which shall constitute a single agreement effective as of the date hereof. Any delivery of an executed counterpart of this Assignment by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of this Assignment.

5. This Assignment shall be binding upon Assignor and its successors and assigns and shall inure to the benefit of Assignors and Assignee and their respective successors and assigns.

6. This Assignment shall be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and, where state law is implicated, the internal laws of the State of California, without giving effect to any principles of conflicts of law.

*REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK.*

6

**IN WITNESS WHEREOF**, Assignors and Assignee have executed this Assignment as of the date first written above.

**KRYSTAL KOACH, INC.,**
a California corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Title:_____

**Agreed and Accepted as of
the date first above written.**

**ASSIGNEE:**

_____,
a _____ corporation

By: _____
Name:_____
Title:_____

**SIGNATURE PAGE TO ASSIGNMENT OF MARKS**

STATE OF CALIFORNIA )

) ss.

COUNTY OF _____ )

    On _____, 2010 before me, _____, a notary public for the state, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

    I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing is true and correct.

    WITNESS my hand and official seal.

_____
Notary Public

8

## Schedule 1

### Marks

9

# EXHIBIT "3"

**Krystal Koach, Inc.**
**PROJECTED 8 - WEEK DIP BUDGET**
**As of 11/19/2010**

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Post-filing |
|---|---|---|---|---|---|---|---|---|---|
| For week ending | 11/26/2010 | 12/3/2010 | 12/10/2010 | 12/17/2010 | 12/24/2010 | 12/31/2010 | 1/7/2011 | 1/14/2011 | Total |
| Receipts | $ 528,011 | $ 1,179,010 | $ 560,100 | $ 909,600 | $ 974,700 | $ 903,640 | $ 897,580 | $ 901,250 | $ 6,853,891 |
| **Disbursements** | | | | | | | | | |
| Chassis Purchases | $ 100,000 | $ 798,000 | $ 321,000 | $ 362,000 | $ 321,000 | $ 362,000 | $ 362,000 | $ 370,000 | $ 2,996,000 |
| Parts Purchases | 50,000 | 450,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 1,400,000 |
| Used Car Trade In Purchases | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 800,000 |
| Rent | | | 81,798 | | | | | 81,798 | 163,596 |
| Employee Costs | 6,448 | 169,000 | 6,448 | 169,000 | 6,448 | 169,000 | 6,448 | 169,000 | 701,792 |
| Mexico Vehicle Fees | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 800,000 |
| Other G&A | 63,950 | 61,186 | 172,627 | 76,186 | 35,950 | 89,186 | 37,083 | 151,730 | 687,898 |
| Contingency | 55,000 | 12,990 | 55,000 | 22,989 | 25,000 | (7,011) | 15,000 | (7,011) | 171,956 |
| Total Operating Disbursements | 475,398 | 1,691,176 | 986,873 | 980,175 | 738,398 | 963,175 | 770,531 | 1,115,517 | 7,721,242 |
| **Administrative Costs** | | | | | | | | | |
| Pro Fees - Debtor Financial Advisor | | 25,000 | | 25,000 | | 25,000 | | 25,000 | 100,000 |
| Pro Fees - Debtor Bankruptcy Counsel | | | | 100,000 | | | | 100,000 | 200,000 |
| Pro Fees - Debtor Litigation Counsel | | 10,000 | | | | | 10,000 | | 20,000 |
| Pro Fees - Lender Legal Counsel | | | | 75,000 | | | | 75,000 | 150,000 |
| Pro Fees - UCC Professionals | | | | 50,000 | | | | 50,000 | 100,000 |
| DIP Fees and Interest | 1,303 | 3,260 | | 4,430 | 1,303 | 3,260 | | 4,430 | 17,986 |
| US Trustee and Other Court Fees | | | 10,000 | | | | | 10,000 | 20,000 |
| Paydown of Lumbermans | | 907,000 | | | | | | | 907,000 |
| Total Administrative Costs | 1,303 | 945,260 | 10,000 | 254,430 | 1,303 | 28,260 | 10,000 | 264,430 | 1,514,986 |
| Net Cash Flow | $ 51,310 | $ (1,457,426) | $ (436,773) | $ (325,005) | $ 234,999 | $ (87,795) | $ 117,049 | $ (478,697) | $ (2,382,338) |
| **Cash Collateral Roller** | | | | | | | | | |
| Opening Cash Collateral | | 51,310 | 893,885 | 657,111 | 332,106 | 567,105 | 479,310 | 596,359 | |
| Plus Cash in From Sales Of Vehicles | 528,011 | 1,179,010 | 560,100 | 909,600 | 974,700 | 903,640 | 897,580 | 901,250 | 6,853,891 |
| Less Cash Disbursements | (476,701) | (2,536,436) | (996,873) | (1,234,605) | (739,701) | (991,435) | (780,531) | (1,379,947) | (9,236,228) |
| Plus DIP Borrowings | | 2,300,000 | 200,000 | | | | | | 2,500,000 |
| Ending Cash | 51,310 | 893,885 | 657,111 | 332,106 | 567,105 | 479,310 | 596,359 | 117,663 | 117,663 |
| **DIP Loan Roller** | | | | | | | | | |
| Opening Loan Balance | 2,500,000 | 2,500,000 | 200,000 | | | | | | 2,500,000 |
| DIP Borrowings | | (2,300,000) | (200,000) | | | | | | (2,500,000) |
| Ending Balance | 2,500,000 | 200,000 | | | | | | | |

**Notes and Key Assumptions:**
1) Assume DIP financing order entered in first week. Access to DIP financing in week 2.
2) Assume that Lumberman's calls LC in week 2 and is paid out of DIP financing.

102

| In re: | | CHAPTER 11 |
|---|---|---|
| **KRYSTAL KOACH, INC.,** | | |
| | **Debtor(s).** | **CASE NO. 8:10-bk-26547-RK** |

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067.

A true and correct copy of the foregoing document described as NOTICE OF MOTION AND MOTION OF DEBTOR FOR ORDER ESTABLISHING SALE PROCEDURES FOR SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS IN SUPPORT THEREOF will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing documents will be served by the court via NEF and hyperlink to the document.  On November 24, 2010, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Ron Bender    rb@lnbrb.com
- Philip A Gasteier    pag@lnbrb.com
- Michael J Hauser    michael.hauser@usdoj.gov
- Krikor J Meshefejian    kjm@lnbrb.com
- Thomas E Shuck    malvarado@pmcos.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Pamela Kohlman Webster    pwebster@buchalter.com
- Michael H Weiss    mw@weissandspees.com, lm@weissandspees.com;jb@weissandspees.com

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL OR ATTORNEY SERVICE:**  On November 24, 2010, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service and/or by attorney service addressed as follows.  Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**Courtesy Copy Delivered via United States Mail**
Hon. Robert Kwan
U. S. Bankruptcy Court/Santa Ana Division
411 West Fourth Street, Suite 5165
Santa Ana, CA  92701-4593

**See Attached Service Lists – All Entities Served via United States Mail**

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on November ___, 2010, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| November 24, 2010 | John Berwick | |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

Krystal Koach
Secured Creditors and RSN
File No. 4824

Counsel for Comerica Bank
Kyle J. Mathews
Sheppard Mullin Richter & Hampton, LLC
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071

Comerica Bank
Attn Director/Officer/Legal Counsel
75 E. Trimble Road, MC 4770
San Jose, CA 95131

Comerica Bank, Successor by Merger
with Comerica Bank-California
75 E. Trimble Road, MC 4770
San Jose, CA 95131

Comerica Bank-California
Attn: Francis Xavier Ferrer
333 W. Santa Clara Street, 12th Floor
San Jose, CA 95113

Comerica Bank-California
Attn Director/Officer/Legal Counsel
55 Almaden Blvd.
San Jose, CA 95113

International Fleet Sales, Inc.
Attn: Corporate Officer
476 McCormick Street
San Leandro, CA 94577

Office of The United States Trustee
411 West Fourth Street
Suite 9041
Santa Ana, CA 92701

Robert J. Cousins, Esq.
Quintairos, Prieto, Wood & Boyer
One East Broward Blvd.
Suite 1400
Fort Lauderdale, Fl 33301

Ford Motor Credit Company LLC
Attn: Elizabeth J. Marshall
One American Rd.
Dearborn, MI 48126
MI Tel. 313-322-3000

Bob Dickman Tire Center, Inc.
Attn: Corporate Officer
221 W 1st Avenue
Junction City, OR 97448

Ford Motor Company
Attn: Scott Muse
PO Box 680020, MD 610
Franklin, TN 37068

In re Krystal Koach, Inc.
20 Largest


Union Bank/Diana Wilson
445 S. Figueroa Street, Suite 403
Los Angeles CA 90071-0000

Finish Masters Paint Supplies
Attn:  Corporate Officer
9162 Rosecrans
Bellflower CA 90706-0000

Blackhawk Manufacturing Inc.
Attn:  Corporate Officer
3122 South Riverside Ave.
Bloomington CA 92316-3511


Solomon, Winnett & Rosenfield
CPA's Inc.
11777 San Vicente Blvd., Suite 777
Los Angeles CA 90049-0000

Newport Laminates
Attn:  Corporate Officer
3121 W. Central Avenue
Santa Ana CA 92704-5302

SE-GI Products, Inc.
Attn:  Corporate Officer
1900 Second Street
Norco CA 92860-0000


JPF Glass Stone
Attn:  Corporate Officer
560 N. Waterman, Unit B
San Bernardino CA 92410-0000

Freedman Seating Company
Attn:  Corporate Officer
4451 Solutions Center
Chicago IL 60677-4004

Wells Fargo Equipment Finance, Inc.
ATTN: Brian Borgelt
733 Marquette Avenue, 7th Floor
Minneapolis MN 55402-0000


US Bancorp Equipment Finance, Inc.
ATTN: Glenn Trump
13010 SW 68th Parkway
Portland OR 97223-0000

CIT Equipment Finance, Inc.
ATTN: Sandra Ryan
10201 Centurion Parkway North
Jacksonville FL 32256-0000

National Liability and Fire Insuran
Kelly, Smith & Murrah, P.C.
4305 Yoakum Blvd.
Houston TX 77006-0000


Wabtec - Vapor
Attn:  Corporate Officer
2259 Reliable Parkway
Chicago IL 60686-0000

Quality Metalcraft, Inc.
Attn:  Corporate Officer
33355 Glendale Ave.
Livonia MI 48150-0000

Infinite Innovations
Attn:  Corporate Officer
2881 N. Lecompte
Springfield MO 65803-5730


Bank of America Leasing & Capital,
ATTN: Stuart Schwartz
2600 West Big Beaver Road
Troy MI 48084-0000

Reliance Steel Company
Attn: Corporate Officer/Svc Ctr Div
File# 53461
Los Angeles CA 90074-3461

ACC Climate Control
Attn:  Corporate Officer
P. O. Box  1905
Elkhart IN 46515-0000


BASF Corporation
Attn:  Corporate Officer
P.O. Box 121151/Dept. 1151
Dallas TX 75312-1151

Thunder Sky
139 Hennessy Road
**Wanchai Hong Kong, China**